REDEPENNING and wife, Respondents, v. DORE and others, Appellants: AMERICAN FAMILY INSURANCE COMPANY, Third-Party Defendant.

*No. 152.  Argued October 3, 1972.—Decided October 31, 1972.*
(Also reported in 201 N. W. 2d 580.)

For the appellants there was a brief by *Stafford, Rosen-baum, Rieser & Hansen* and *Richard A. Hollern,* all of Madison, and oral argument by *Mr. Hollern.*

For the respondents there was a brief and oral argument by *William E. Johnson* of Madison.

BEILFUSS, J. The defendants-appellants contend:

1. The verdict should be set aside and a new trial granted because (a) the verdict is contrary to the evidence; (b) the verdict is perverse as a result of passion and prejudice; and (c) it is required in the interest of justice.

2. The jury awards in several questions on damages are excessive and should be reduced with an option of a new trial to plaintiffs-respondents.

In *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 91, 92, 102 N. W. 2d 393, we said, ". . . where an excessive verdict is not due to perversity or prejudice, and is not the result of error occurring during the course of trial, the plaintiff should be granted the option of remitting the excess over and above such sum as the court shall determine is the reasonable amount of the plaintiff's damages, or of having a new trial on the issue of damages. . . ." It follows that in those instances

where the verdict is the result of perversity or prejudice or is the result of prejudicial error, the court does not fix the reasonable amount of the damages but orders a new trial for the defendant.

The defendants here contend that the verdict is perverse, that it is contrary to the evidence, that it is excessive. We will first consider their contention that it is "perverse and showed the results of passion and prejudice."

A verdict is perverse when the jury clearly refuses to follow the direction or instruction of the trial court upon a point of law,[3] or where the verdict reflects highly emotional, inflammatory or immaterial considerations, or an obvious prejudgment with no attempt to be fair.

The trial judge, who is in a better position to determine whether perversity permeated the verdict, concluded it did not. This conclusion will not be upset unless it can be shown to be an abuse of discretion.

Other than the contentions that the amounts awarded by the jury are excessive or not supported by evidence, the defendants make no claims upon which to base a conclusion of perversity. Excessiveness alone, except perhaps in a case where it is grossly so and readily apparent, is not sufficient to label a verdict perverse.[4] Likewise minor awards not supported by any evidence do not necessarily indicate perversity.

We have examined the entire record [5] and do not find elements sufficient to establish perversity; in any event, the trial court did not abuse its discretion and the verdict will not be set aside as perverse.

We will consider the claim of the insufficiency of the evidence together with the claim of excessiveness even

[3] *Callahan v. Chicago & N. W. Ry. Co.* (1915), 161 Wis. 288, 154 N. W. 449.

[4] *Brown v. Montgomery Ward & Co.* (1936), 221 Wis. 628, 267 N. W. 292.

[5] The case is here upon a partial transcript covering just the testimony and exhibits on damages.

though a complete want of evidence as to be substantial award of damages could require a new trial for defendants, whereas just excessiveness would result in an option or remittitur or a new trial for the plaintiffs.[6]

It is apparent from its memorandum opinion that the trial court analyzed the evidence in light of the defendants' motions after verdict. It is further apparent the trial judge concluded that the verdict is supported by the evidence and that the amounts awarded as damages, although high, are not excessive.[7] We agree.

Notwithstanding our opinion that an affirmance of the judgment can rest upon the adequacy of the trial court's memorandum, because of our belief that the amounts awarded reach the upper limits of reasonableness and that the sufficiency of the proof to sustain some of the awards is somewhat questionable, we deem it advisable to discuss some of the evidence.

The defendants-appellants contend that the $1,000 award for loss of services of plaintiffs' daughter is excessive. The award is not excessive and the jury had reasonable grounds to make such an award. The evidence indicates that Diane provided many services to her family. She helped with the housework, cooking, baby-sat, made purchases for the family, and did other household and family chores. Her mother testified that Diane did just everything and these services had an economic value to the family. This evidence was not rebutted nor contradicted by appellants. A reasonable jury could reach such an award based on this evidence.

The appellants argue that there must be exacting testimony as to the value of the pecuniary loss. The law makes no such requirement. The reason is that it is impossible to provide an adequate mathematical formula

---

[6] *Powers v. Allstate Ins. Co., supra.*

[7] The trial court, in one instance in the six-page memorandum, does describe the damages as excessive. We believe this is only an inadvertent use of the word because it is inapposite to the entire context of the memorandum.

or rule of law to be applied in all cases which the jury can utilize in its determination. So the jury is not held to any fixed and precise rule in fixing the amount of damages—but can compensate pecuniary losses or injuries from such amounts that find reasonable support in the evidence and are based upon the jurors' common knowledge and judgment.

The appellants allege that the $3,000 award for medical and hospital expenses incurred by Mr. Redepenning for the care and treatment of his wife's resulting injuries is not supported by the evidence. This contention is grounded on the proposition that the highest award that could be sustained here is $1,664.24—the jury awarded almost double the amount. The record indicates the following doctors' and hospital expenses:

| | |
|---|---|
| Dr. Shropshire | $    40.00 |
| Dr. Suckle | 321.00 |
| Dr. Vogt | 135.00 |
| Dr. Calden | 70.00 |
| X rays | 52.00 |
| Madison General Hospital | 646.40 |
| Total | $1,264.40 |

In addition, Dr. Suckle estimated a drug cost of $10 per month for Bonine, and Dr. Shropshire testified that Triavil 2–10 cost $6.15 for 50 tablets. Both of these medications were used to treat Julia from the date of the accident through trial. The accident occurred on June 15, 1968, and the jury returned its verdict on January 21, 1971. This is at least a thirty-one month period. Dr. Suckle then testified that a patient usually takes about 100 tablets of these drugs per month—that is, one of each drug three times per day. Based on appellants' own formula, thirty-one months of Triavil 2–10 at $12.30 for 100 tablets per month is $381.30; and 100 tablets of

Bonine at an average cost of $10 per month for thirty-one months is $310. These two subtotals equal $691.30. Other drug bills incurred add up to another $87.84. Further, Mr. Redepenning stated that he spent $60 for 20 trips at 30 miles each to bring his wife to the doctor in Madison; and incurred $90 in laundry bills. He also testified that he spent his five-week vacation without pay to stay home and take care of his wife, children, and to perform the housework. He stated that the accrual pay for this five-week period would be approximately $875.

The reasonable value of nursing services made necessary because of the injury is a compensable item. Mr. Redepenning did render services akin to home nursing service and stayed away from his job to do so. He should be entitled to include this service in his claim; but the measure of damages is what these services would reasonable and customarily cost in his community [8] and not what earnings he lost. However, the defendants did not object to this testimony and cannot be heard to complain now.

These above figures include all costs set out in Exhibits 56 and 57. The former dealt with the drug bills and the latter with hospital and doctors' bills. From the evidence most favorable to the plaintiffs, the grand total of these costs is $3,058.54. The jury award of $3,000 should be sustained.

The appellants maintain that the $15,000 award for loss of Julia's services, society and companionship to Mr. Redepenning is excessive. No evidence was offered to controvert the testimony that Mr. Redepenning did not suffer such losses. Further, the losses involved in this element of damages cover many other intangibles such as love, affection, sex and solace. The value of these losses is incapable of precise determination.

[8] *Moritz v. Allied American Mut. Fire Ins. Co.* (1965), 27 Wis. 2d 13, 133 N. W. 2d 235.

The record shows that their marital relationship was normal. True, they argued at times and divorce was threatened, but at other times they were very compatible. There was no evidence that their marriage was any more unstable than any other marriage. Before the accident Julia did everything around the house—taking care of the children, cleaning house, doing the washing, and having marital relations with her husband. Since the accident she does almost nothing. She has no interest in herself, her husband or the children, refuses to do housework, and has not had sexual relations with her husband since the accident—almost two and one-half years. There was testimony that it was difficult to get along with her at times before the accident, but since the accident it is almost always impossible. Dr. Calden testified that she is mentally depressed, does not care to live anymore, gets along poorly with people, is very nervous and wants to be left alone. This evidence would clearly support the proposition that Mr. Redepenning has been deprived of her services, society and companionship and will continue to be deprived of such in the future. In light of this uncontroverted evidence, the jury award does not seem to be unreasonable or excessive.

The defendants-appellants finally urge that the $75,000 award to Julia Redepenning for her personal injuries, for past and future pain and suffering, future impairment of her earning capacity, and future medical expenses is excessive and that there is no evidence of compensable traumatic neurosis.

At the time Julia was admitted to the hospital on the day of the accident she was unconscious. She had a fragmented break of the humerus in her left arm near the shoulder, a badly lacerated right ear, a deep laceration to the left knee, small lacerations to her forehead, and glass in her forehead; and numerous bruises and abrasions to various parts of her body, some more severe than others. After she regained consciousness she complained

of pain in the neck and back areas, dizziness, and was emotionally upset. She was in the hospital about two weeks and has since seen several medical specialists.

Dr. Shropshire, a general practitioner, saw her at the hospital on three occasions after her hospitalization. He testified that she had severe neck pain, pains in her head and shoulder, dizziness and was emotionally upset. Mrs. Redepenning testified that she had glass in her head for a month after the accident; scars on her head; her left leg hurt; her arm bothered her and it could not be used normally; her back was hurt; and she was frequently dizzy when she stood up, turned quickly or tried to get up. Her prior dizziness had not completely cleared up but it seldom bothered her before the accident. Since the accident it has continually affected her and Dr. Shropshire is of the opinion the accident must have at least greatly intensified and aggravated this vertigo.

Dr. Suckle, a neurologist, stated that he believed she had a concussion of the labyrinth (the balance mechanism in the middle ear), which was caused by the accident and that this accounts for her continued dizziness. Suckle's opinion was made with knowledge of the fact that earlier in Julia's life she suffered from Meniere's disease. There was evidence that Julia was struck behind the left ear, which is consistent with an aggravation if not the sole cause of her dizziness after the accident. Dr. Miezio, a psychiatrist, testified that, based on the hospital records, after the accident she was unconscious for a considerable period of time—this he felt clearly indicated that she suffered from a brain concussion caused by the accident, and that her background history was not a contributing cause of her present problems.

Dr. Vogt, an orthopedic surgeon who treated Julia in the emergency room, testified that she suffered head, facial and body injuries. He stated that on the October 15, 1970, doctor visit he found that she had restricted motions of the shoulder and she lacked the last 45 percent

degree of full elevation in her arm, and when forcing its elevation it caused her pain in the left shoulder. She also had scars over the front of the left knee several inches long. Dr. Vogt also stated that it was his opinion to a reasonable degree of medical certainty that the injury to her left arm was permanent in nature and would impair her income-earning capacity in the job she was doing before the accident.

Dr. Shropshire stated that her mental condition in the hospital while being treated for physical injuries was that she was emotionally upset and he concluded she suffered from depression. He noticed that she cried a lot, was unable to sleep, lost her appetite, was restless, frustrated, and felt a sense of hopelessness, all being cardinal signs of organic depression. Dr. Shropshire testified, without objection by appellants, that:

"It is my opinion that, in addition to any physical injuries which Mrs. Redepenning sustained, she also sustained a severe emotional reaction to the accident and the subsequent death of her daughter. This has caused her to be acutely and chronically depressed since that time. It is my opinion that, with medical therapy and psychiatric therapy, the patient's depression can be alleviated. I feel, however, that she will bear psychological scars from this experience for the remainder of her life."

He then testified (without objection) that it was his opinion to a reasonable degree of medical certainty that the accident of June 15, 1968, was the cause of not only her physical injuries but also the emotional and the mental injuries sustained. After all of this testimony, he then testified over the appellants' objection that the emotional injuries sustained will be of a permanent nature. This objection now complained of comes too late since the answer was nothing more than a reiteration of the unobjected testimony that she will bear these psychological scars for the remainder of her life. The court overruled the objection because it felt Dr. Shropshire was qualified

to answer this question even though he was a general practitioner. The judge in his discretion felt that there was satisfactory proof as to the doctor's qualification to answer that question. Appellants, on appeal, have offered no sufficient evidence that the judge abused his discretion in making this finding.

Dr. Calden, a clinical psychologist, testified that Julia was very depressed and recommended long-term psychiatric care. It was his opinion that she suffered a severe emotional reaction as the result of the accident and her present psychological condition was caused by the accident.

The opinion of Dr. Miezio, a psychiatrist, was that:

"My impression was that the patient is suffering from a moderately severe neurosis of a mixed type with predominant depressive symptoms. This appears to have progressed in severity in the past year. In view of her previous adequate personal, marital and vocational adjustment and the predominance of symptoms centering on the accident, death and loss of the daughter, I concluded that the accident was the significant cause of her mental and emotional disorder.

"In view of the progression and severity in the past year, I feel that the disorder can be considered chronic and permanent.

"A period of psychiatric treatment on a weekly basis for a period of eighteen to thirty-six months may considerably alleviate the more distressing symptoms. In any event, there would be some degree of persistent emotional disability.

"The above opinion is based upon a reasonable medical certainty."

Dr. Miezio's opinion was that her psychiatric injury which she suffers from will significantly impair her future earning capacity. The doctor then states:

". . . she would not be able to tolerate the jobs which demanded a high rate of production, say, her previous job at the porcelain company, those which were more competitive in nature and demanded that there be a

constant rate of production. She would, in other words, have to be limited to less skilled, semi-skilled, unskilled kinds of work, which—which would allow some leeway if she had recurrence of her dizziness or if she had some of the spells of anxiousness, nervousness, or emotional mood swings that I am talking about. In her present job she says that, if she gets dizziness, she is able to sit down or lean back and rest. In a factory or assembly line situation she would be unable to do that."

As discussed before, Dr. Vogt testified that her left arm is permanently injured and sufficient enough to impair her earning capacity insofar as utilizing her arm in the job she was doing. The record clearly shows then that both her physical and mental injuries have directly affected her future earning capacity, and there was no proffered evidence to show that she would not have continued to work if she had not been injured. She can no longer work in skilled or semiskilled work. This opinion is supported by the fact that she can no longer work at her job as an assembly line worker and now works at a food dispenser canteen at a wage that is about one dollar less per hour. Based on her life expectancy, her prior income, her impaired future earning capacity, her damages are substantial.[9]

As for future medical expenses, the record shows uncontrovertedly that she will need psychiatric care and treatment for the next two or three years at $30 per session or about $1,500 per year. This charge was testified to as reasonable. This cost alone would total $4,500. Also, she is still under medication and the facts imply that she will continue to take such medication for her psychiatric condition in the future.

In discussing past and future pain and suffering, three things must be kept in mind. First, the mental and physical injuries as set forth above have caused considerable

[9] *Reinke v. Woltjen* (1966), 32 Wis. 2d 653, 660, 146 N. W. 2d 493.

past pain and suffering. Second, an accurate assessment of money damages for pain and suffering is difficult to determine; conscious pain and suffering cannot be reduced to an hourly basis or a precise mathematical formula. *Blaisdell v. Allstate Ins. Co.* (1957), 1 Wis. 2d 19, 82 N. W. 2d 886, and *Hamilton v. Reinemann* (1940), 233 Wis. 572, 290 N. W. 194. Thirdly, this court has held that damages for traumatic neurosis when associated with physical injuries are compensable in personal injury actions. *Ver Hagen v. Gibbons* (1970), 47 Wis. 2d 220, 177 N. W. 2d 83; *Riehl v. De Quaine* (1964), 24 Wis. 2d 23, 127 N. W. 2d 788; and *Newberger v. Pokrass* (1967), 33 Wis. 2d 569, 577–579, 148 N. W. 2d 80. There is evidence in the record to establish that the neurosis is associated with Julia's physical injuries and that only a part of it was caused by her daughter's death; but it is simply impossible to adequately segregate these causal factors with any precision. However, there is no doubt that they were all caused by the accident. Therefore they are not fabricated nor do they lack substantial basis in evidentiary fact.

Dr. Shropshire testified that it was his opinion that in addition to any physical injuries she sustained, she also sustained a severe emotional reaction to the accident and the subsequent death of her daughter. These psychiatric injuries are of a permanent nature. Also, again, Dr. Calden stated her present psychological condition and the severe emotional reaction she is suffering was caused by and the result of the accident. Dr. Calden was also convinced that even with psychiatric care she will never fully recover. Finally, as Dr. Miezio stated:

"There was emotional lability with frequent periods of crying during the interview. The symptoms of a mixed neurotic and psychosomatic type are detailed above. They include depression, anxiety, headache, irritability, feelings of inadequacy and worthlessness, insomnia, nightmares, impaired concentration and memory, fatique, and

brief misinterpretations of reality, that is, confusing others for her deceased daughter. Obviously, there has been deterioration of the patient's personal adjustment and as a result of the family's previous cohesiveness.

"My impression was that the patient is suffering from a moderately severe neurosis of a mixed type with predominant depressive symptoms. . . . I concluded that the accident was the significant cause of her mental and emotional disorder.

"In view of the progression and severity in the past year, I feel that the disorder can be considered chronic and permanent.

". . .

"The above opinion is based upon a reasonable degree of medical certainty."

We believe that the evidence sufficiently establishes that the accident was the cause, a substantial factor, in producing the injuries, both physical and mental, sustained by Mrs. Redepenning. The evidence taken as a whole would substantiate such an award—especially in light of the fact that practically all of it was uncontroverted. Therefore, looking at these damages most favorable to the plaintiffs, and the fact that there was credible evidence that went to the jury, and the trial court approved the verdict, it should not be disturbed. *Burke v. Poeschl Brothers, Inc.* (1968), 38 Wis. 2d 225, 156 N. W. 2d 378, and *Bach v. Liberty Mut. Fire Ins. Co.* (1967), 36 Wis. 2d 72, 152 N. W. 2d 911.

*By the Court.*—Judgment affirmed.