S.C. Johnson & Son, Inc., Plaintiff-Respondent,

v.

Milton E. Morris and Katherine Scheller,
Defendants,

Buske Lines, Inc., Buske Intermodal, LLC
and Thomas H. Buske, Defendants-Appellants,

Tom Russell, Transportation Associates, Inc.,
d/b/a JMP Co. and JMP Intermodal, Inc.,
Defendants-Co-Appellants.†

Court of Appeals

*No. 2008AP1647. Submitted on briefs September 24, 2009.
—Decided December 2, 2009.*

2010 WI App 6

(Also reported in 779 N.W.2d 19.)

† Petition to Review denied 4/19/10. Abrahamson, C.J. and Bradley, J., dissent.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *James T. Murray, Jr.*, and *Michael J. Wirth* of *Peterson, Johnson & Murray S.C.* of Milwaukee.

On behalf of the defendants-co-appellants, the cause was submitted on the briefs of *Franklyn M. Gimbel, Kathryn A. Keppel* and *Steven C. McGaver* of *Gimbel, Reilly, Guerin & Brown* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Jeffrey L. William, Donna M.*

*Welch, Michael D. Foster, Sarah J. Donnell* and *Lawrence M. Griffin* of *Kirkland & Ellis LLP*, pro hac vice, of Chicago and *Mark A. Cameli* of *Reinhart Boerner Van Deuren S.C.* of Milwaukee.

Before Brown, C.J., Anderson and Snyder, JJ.

¶ 1. BROWN, C.J. Tom Russell and Thomas H. Buske raise a host of issues, most of them without merit. But three issues are novel and require us to discuss them at length. We will identify these three issues and give our brief answer first and then discuss them seriatim. After that, we will deal with the meritless issues. Ultimately, we affirm the trial court in all respects.

¶ 2. The first issue concerns a party's continuous invocation of the Fifth Amendment privilege against self-incrimination in a civil action where that party later waives the privilege in the middle of trial when all discovery and preparation for trial is complete and the other party's theory of the case has been established. Federal case law instructs that this decision requires the trial court to balance the prejudice to both parties. And one of the most important factors in the balancing test is the timing of the request to withdraw because invoking during discovery and then waiting until trial to withdraw runs the danger of undermining the purpose of discovery. We find this authority persuasive and adopt it in Wisconsin. The trial court did not erroneously exercise its discretion in concluding that Russell's attempt to withdraw the privilege in the middle of trial would give S.C. Johnson & Son, Inc., no opportunity to conduct follow-up research or effectively cross-examine on a subject matter essential to its case. We affirm the denial.

773

¶ 3. Second, this action alleged the intentional torts of fraud and misrepresentation. Russell and Buske claim that S.C. Johnson had a duty to put a stop to the conspiracy at a much earlier date because it should have figured out for itself that something was amiss and duly mitigated the damage. We understand the issue to be whether S.C. Johnson had a duty to mitigate even in the absence of actual knowledge of the conspiracy. In other words, did S.C. Johnson have a duty to identify the warning signs that a conspiracy existed? We again adopt persuasive federal case law which explains that expanding the duty to mitigate in such a way as to place a burden on the victim to investigate whether warning signals existed would allow tortfeasors to purposely exploit a victim's weak internal investigation mechanism and then use it as an affirmative defense at trial. We conclude that adopting Russell and Buske's position would place too high a burden on victims. Thus, as the trial court ruled, actual knowledge is required for the duty of mitigation to apply.

¶ 4. And third, is the multiple damages provision of the Wisconsin Organized Crime Control Act (WOCCA) remedial such that the entire damage award is doubled? The answer is "yes" because that provision, like its federal counterpart, is a remedy to address the private economic injury aspect of the violation, not the penal, criminal feature. Therefore, we again affirm the trial court, and thus uphold its doubling of the entire damage award.

## BACKGROUND

¶ 5. A $203.8 million verdict in S.C. Johnson's favor was reached after substantial discovery, a four-week jury trial, and a series of motions brought before, during, and after the trial and verdict. Suffice it to say,

the record in this case is voluminous, spanning thousands of pages, and the relevant facts depend on which issue we are addressing. So except to summarize the dispute, we will present only those facts which are pertinent.[1]

¶ 6. For about a decade, certain S.C. Johnson employees invited bribes and kick-backs from transportation companies and, in exchange, submitted inflated

[1] We note that neither Russell's nor Buske's appellate counsel properly cite to the record. Record cites are often missing. An appellate court is improperly burdened where briefs fail to consistently and accurately cite to the record. *Meyer v. Fronimades*, 2 Wis. 2d 89, 93–94, 86 N.W.2d 25 (1957). Even more troubling is that both appellate counsel failed to include in the appendix *all* "the findings or opinion[s] of the circuit court . . . including oral or written rulings or decisions showing the circuit court's reasoning regarding those issues," as required by WIS. STAT. RULE 809.19(2)(a) (2007–08). We had to sift through the voluminous record to find the trial court's rulings on some of the issues on appeal. We impose a fine of $150 on Buske's appellate counsel and a fine of $150 on Russell's appellate counsel. *See State v. Bons*, 2007 WI App 124, ¶¶ 21–25, 301 Wis. 2d 227, 731 N.W.2d 367. Both fines are payable to the clerk of this court within thirty days of the release of this opinion. *See id.*, ¶ 25.

Justice Robert Hansen once wrote the now familiar phrase that "[a]n appellate court is not a performing bear, required to dance to each and every tune played on an appeal." *State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978). We are not required to search for the proverbial needle in the haystack that the appellant asserts exists but has not cited to. *See Keplin v. Hardware Mut. Cas. Co.*, 24 Wis. 2d 319, 332, 129 N.W.2d 321 (1964). So to the extent that we may have missed an objection or point of contention, the fault lies with appellate counsel, not this court.

All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

invoices to S.C. Johnson on behalf of those transportation companies. In 2004 when S.C. Johnson discovered the conspiracy, it sued two employees, Milton E. Morris and Katherine M. Scheller, for breach of fiduciary duty; and it sued Russell, Buske, and several transportation companies for fraudulent misrepresentation, conspiracy to violate Wis. Stat. § 134.05, fraud, and violations of the WOCCA. Russell and Buske appeal from a final judgment finding that Russell, Buske, and their transportation companies,[2] along with the two S.C. Johnson employees (Morris and Scheller), had engaged in a civil conspiracy to overcharge S.C. Johnson for transportation services.

## DISCUSSION

### *Withdrawing Fifth Amendment Rights in a Civil Action*

¶ 7. The first issue we address is Russell's attempted withdrawal of his invocation of the Fifth Amendment privilege against self-incrimination in a civil action. Russell and Buske claim that the trial court wrongfully denied Russell's request to withdraw his privilege and testify during the final week of trial. The pertinent facts related to this issue are as follows.

¶ 8. During the discovery period, Russell testified as a corporate representative of his transportation companies, JMP Co. and JMP Intermodal, Inc. But, on

---

[2] When we refer to "Buske," we mean to include Thomas Buske, or where appropriate, Thomas Buske and his transportation companies, Buske Lines, Inc., and Buske Intermodal, LLC. When we refer to "Russell," we mean to include Tom Russell, or where appropriate, Tom Russell and his transportation companies, Transportation Associates, Inc. d/b/a JMP Co. and JMP Intermodal, Inc.

his counsel's advice, he refused to answer questions on certain topics he claimed to be related to his individual exposure as opposed to his company's corporate exposure, on grounds that the answers might impact possible criminal prosecution. He based his refusal on the Fifth Amendment. And throughout the approximately three years of discovery, Russell continued to assert his Fifth Amendment privilege except when he answered questions in his corporate capacity.

¶ 9. Then shortly before trial, Russell's counsel disclosed Russell as a "may call" witness. S.C. Johnson filed an objection. This led to a hearing only days before the trial was scheduled wherein the trial court stated its intent to hear Russell's proffered testimony before ruling on S.C. Johnson's objection. But Russell's counsel stated he was not sure if Russell would testify, so the court held the issue in abeyance pending Russell's final decision.

¶ 10. On the Friday of the third week of trial, Russell's counsel made his decision. Russell would testify. The following Monday, during the final week of trial, Russell withdrew his Fifth Amendment invocation and made his proffer by testimony. After hearing the proffer and argument from both parties, the trial court denied Russell's motion to withdraw for reasons we will explain shortly.

*1. The Legal Principles*

▆

¶ 11. Wisconsin has long recognized that a person may invoke the Fifth Amendment privilege against self-incrimination in a civil action as protection from the adverse use of such evidence in a subsequent criminal action. *Grognet v. Fox Valley Trucking Serv.*,

45 Wis. 2d 235, 239, 172 N.W.2d 812 (1969). But there is no Wisconsin law addressing when an opposing party may object if the person originally claiming the privilege in a civil action seeks to withdraw the privilege and testify. There are, however, several federal cases that have.

■■

¶ 12. Federal case law explains that "courts, upon an appropriate motion, should seek out those ways that further the goal of permitting as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege." *United States v. Certain Real Prop. and Premises Known as: 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 84 (2d Cir. 1995). The reason for this policy is that "*all* parties—those who invoke the Fifth Amendment and those who oppose them—should be afforded every reasonable opportunity to litigate a civil case fully and . . . exercise of Fifth Amendment rights should not be made unnecessarily costly." *Id.* at 83–84. And because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side. *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir. 1994).

■

¶ 13. Based on this policy, the general rule is that if the claimant makes a timely request to the court, the court should explore all possible measures to select that means which strikes a fair balance and accommodates both parties. *See id.* at 191, 194; *Certain Real Prop.*, 55 F.3d at 84. Striking a fair balance between both parties requires a careful assessment of each case's precise facts. *Certain Real Prop.*, 55 F.3d at 85. The court

should give due consideration to the nature of the proceeding and the potential for harm or prejudice to opposing parties. *Id.* at 84.

¶ 14. One of the most important factors in the balancing process is the timing of the withdrawal. *See, e.g., id.* at 84–85. "How" and "when" are two important questions to ask. *Id.* Timing can mean everything when determining whether the petitioner invoked the privilege primarily to abuse, manipulate or gain an unfair strategic advantage over opposing parties. *See id.* Invoking the privilege during discovery only to later withdraw the privilege may give the invoking party a decided advantage in that he or she can delay having to answer questions until after having had the opportunity to watch the adverse party's case develop. It allows the invoking party to conceal information and then tailor the invoker's own version of the events to meet the opposition's theory of the case and the evidence garnered in support of it. As one commenter explained:

> By forcing plaintiffs to seek evidence from sources other than the defendants and their staffs, it increases plaintiffs' expenses and delays their progress. Such delays, in addition to their usual benefits, enable invokers siding with the defense to buy time in which to decide whether to waive the privilege and testify. If they do decide to testify and submit to depositions, the delays will have allowed them to see the other evidence the plaintiff has gathered and to tailor their versions of events accordingly.

Robert Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases,* 91 Yale L.J. 1062, 1081–82 (1982).

¶ 15. This same commentator is of the view that a party who invokes the privilege up until trial and then withdraws the privilege to testify at trial "mocks" the

discovery process by gaining tremendous strategic advantages from concealing its version of events until trial. *Id.* at 1131. The late withdrawal "forecloses the plaintiff's opportunity to scrutinize, investigate, and prepare to neutralize the [invokers'] version of events, an endeavor for which ample time would have been available save for the earlier invokings." *Id.* If the trial has begun before past invokers announce their desire to waive, accommodating their testimony usually will require that the trial be postponed, "for the plaintiff certainly would be prejudiced if required to depose the invokers, follow up the depositions, and adjust his case accordingly while fully embroiled in the trial." *Id.*

¶ 16. *Graystone Nash* melded these concerns into a representative hypothetical explaining that withdrawal may be abusive

> when one party invokes the Fifth Amendment during discovery, but on the eve of trial changes his mind and decides to waive the privilege. At that [time], the adverse party—having conducted discovery and prepared the case without the benefit of knowing the content of the privileged matter—would be placed at a disadvantage. The opportunity to combat the newly available testimony might no longer exist, a new investigation could be required, and orderly trial preparation could be disrupted. In such circumstances, the belated waiver of the privilege could be unfair.

*Graystone Nash*, 25 F.3d at 191.

¶ 17. This hypothetical was played out in *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989), and *Certain Real Property*, among others. *See Certain Real Prop.*, 55 F.3d at 85 (collecting cases). In *Gutierrez-Rodriguez*, the trial court ruled four days before trial that the defendant would be precluded from testifying because he had earlier refused to answer

questions during discovery. *Gutierrez-Rodriguez*, 882 F.2d at 577. The First Circuit determined that the "defendant may not use the [F]ifth [A]mendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial." *Id.* And in *Certain Real Property*, the Second Circuit held that "if the litigant's request to waive comes only at the 'eleventh hour' and appears to be part of a manipulative, 'cat-and-mouse approach' to the litigation, a trial court may be fully entitled, for example, to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege." *Certain Real Prop.*, 55 F.3d at 85.

■■

¶ 18. But a late withdrawal does not automatically lead to a finding of abuse requiring a complete bar of submitting evidence. The proper sanction and accommodation ultimately depends on the particular facts of a case. The trial court may decide that a complete bar to testimony is unnecessary. *See, e.g., F.T.C. v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1291 (D. Minn. 1985) (allowing the defendant to testify even though he had previously invoked his Fifth Amendment privilege during discovery because the plaintiff was not unfairly surprised); *see also Certain Real Prop.*, 55 F.3d at 84 n.6 (listing different potential sanctions). If the late withdrawal does not in fact unduly prejudice the adversary, and if there is nothing to suggest the attempted withdrawal was used abusively or to gain an unfair tactical advantage, then the court should be especially inclined to permit the withdrawal. *Certain Real Prop.*, 55 F.3d at 84. However, as long as a trial court considers the relevant factors and acts with moderation to accommodate both a litigant's valid Fifth Amendment interests

and the opposing parties' needs in having the litigation conducted fairly, *Certain Real Property* stated that it would not disturb the measures used by that court in the exercise of its discretion. *Id.* at 83 n.4, 85.

¶ 19. The importance of *Certain Real Property*'s conclusion that this decision is made in the exercise of a trial court's discretion cannot be understated. The trial court is in a far better position than an appellate court to determine whether prejudice has evolved as a consequence of the belated withdrawal of the invocation. It strikes us as eminently fair and reasonable that the trial court have the responsibility to perform the balancing test and make the ultimate decision in the exercise of its discretion and we adopt it. This means, of course, that we will defer to the trial court's discretionary determination.

*2. The Trial Court's Decision*

██

¶ 20. In this case, the trial court started its balancing by looking at whether S.C. Johnson would be prejudiced. The trial court reasoned that "[i]f [Russell's] answer had been given during discovery . . . follow up and additional discovery could have occurred. If that answer is given here in court during the course of the trial [S.C. Johnson] has no way of investigating or conducting discovery on or attempting to verify or disprove the answer that is given."

¶ 21. The trial court then looked at whether the missed opportunity for follow up would create actual prejudice based on whether the subject matter of the proffered testimony was important to the case. The subject matter in question here was Russell's "T.R. Russell" bank account, which Russell allegedly used to

distribute money for the conspiracy. The trial court determined that the subject matter was "central to and critical to" S.C. Johnson's claim against Russell and his two companies. And the trial court commented that "the TR Russell account . . . [has] multiple years of unexplained transactions of which [S.C. Johnson] is aware but knows nothing more about because Mr. Russell has declined to reveal any information." The trial court continued, stating that "there is no way hearing the explanation or answer for the first time during the course of trial today that [S.C. Johnson] has of effectively dealing with that or counteracting it." The court explained that the lack of opportunity for S.C. Johnson to conduct discovery on such a crucial subject matter is what placed it at a very distinct disadvantage. Moreover, the court concluded that it could perceive of no way to admit the testimony and also blunt the prejudicial effect because Russell did not decide to withdraw his Fifth Amendment privilege until the Friday of the third week of trial. The court therefore concluded that allowing Russell to testify "after the [eleventh] hour and even after the [twelfth] hour," would unduly prejudice S.C. Johnson.

██

¶ 22. We recognize that barring testimony is a severe remedy, and it should not be used if instead of "level[ing] the playing field," it tilts it strongly in favor of the adversary. *See Graystone Nash*, 25 F.3d at 193. But the preceding legal principles lead us to conclude that the trial court here properly exercised its discretion. One of our tasks in deciding a question of discretion is to look to the record for support of the discretionary ruling by the trial court. *State v. LaCount*, 2007 WI App 116, ¶ 14, 301 Wis. 2d 472, 732 N.W.2d 29, *aff'd*, 2008 WI 59, 310 Wis. 2d 85, 750 N.W.2d 780. Here, the

record convinces us that S.C. Johnson may have expended enough resources during the more than three years of discovery to obtain a substantial amount of information, but it still did not have the information that would answer why the money was there, how it got there, and who was involved. Those pieces of information would no doubt be highly relevant to Russell's role in the conspiracy. And those missing pieces were what Russell withheld until he unilaterally decided, more than halfway through trial, that the information should be used in his defense, in his own way. We sustain the trial court's decision.

### Mitigating an Intentional Tort

¶ 23. The second novel issue Buske and Russell raise is whether a corporate victim of an intentional tort must have actual knowledge of the tort before it is required to mitigate damages, as S.C. Johnson asserts, or whether the duty to mitigate arises when it is shown that the victim might have found out about the tort earlier had there been a better internal corporate investigation mechanism. As Russell and Buske put it, the issue is whether the victim "should have known" that misconduct was occurring.

¶ 24. The law in Wisconsin is well settled that there is a duty to mitigate both breaches of contract and negligence causes of action. "An injured party has a duty to mitigate damages, that is, to use reasonable means under the circumstances to avoid or minimize the damages. An injured party cannot recover any item of damage which could have been avoided." *Kuhlman, Inc. v. G. Heileman Brewing Co., Inc.*, 83 Wis. 2d 749, 752, 266 N.W.2d 382 (1978). But Wisconsin has never applied the duty to parties injured by an intentional act.

¶ 25. Intentional tortfeasors in other states have argued, as Russell and Buske do here, that courts should expand the duty to mitigate to the victims of intentional torts that should have known about the tort. The leading case is *Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245 (S.D.N.Y. 1984). There, the intentional tortfeasor argued that the victim company had a duty to mitigate because of its "negligent disregard of any fraud . . . . [Had the victims] adhered to their ordinary business practices or exercised reasonable diligence, the fraud alleged in the complaint could not have occurred." *Id.* at 248.

¶ 26. Since the intentional tortfeasor's argument required expanding the duty, *Morgan* started by explaining why the duty existed in other contexts. The court reasoned that the duty to mitigate is a social and economic policy designed to protect and conserve the welfare and prosperity of the community as a whole. *Id.* And for breaches of contract and negligence actions, the result of barring a victim from recovering damages he or she could have avoided in the exercise of reasonable diligence "obviously comports with the social policies underlying the mitigation of damages rule in that it discourages the needless accumulation of damages that can reasonably be avoided, and it also has the common-sense effect of preventing recovery for wounds which in a practical sense are self-inflicted." *Id.* at 249.

¶ 27. The *Morgan* court then explained why these very policy reasons actually supported not expanding the duty to intentional torts. The court reasoned that the proposed expansion would serve no social value because it would allow an intentional tortfeasor to assert the very weakness he or she exploited as a ground for limiting the victim's damages claim. *Id.* A duty to mitigate an intentional tort would merely

insulate one who has committed an intentional, antisocial act from accounting to the person he or she has injured for all of the consequences flowing from that act and thus might have the undesired secondary effect of promoting the tortfeasor's activity. *Id.* We see no reason why the same policy should not apply in Wisconsin.

¶ 28. As the trial court pointed out here, the policy behind the duty to mitigate is evident in the Restatement's section on avoidable consequences. *See* RESTATEMENT (SECOND) OF TORTS § 918(2) (1979). This section states that "[o]ne is not prevented from recovering damages for a particular harm resulting from a tort if the tortfeasor intended the harm or was aware of it and was recklessly disregardful of it, unless the injured person with knowledge of the danger of the harm intentionally or heedlessly failed to protect his [or her] own interests." *Id.* This rule protects the "merely careless or stupid person" from consequences that the tortfeasor intended or was willing to have occurred, but it does not protect "the person who stubbornly refuses to protect his [or her] own interests" from the consequences of that same tortfeasor's conduct. *Id.*, cmt. a.

¶ 29. We agree. It makes no sense to us that an injured party should be held responsible for negligently failing to discover that someone else was intentionally harming them. Instead, if one party is intentionally harming another, logic would hold that the duty of the victim should be less than it would be for contractual breaches or negligence. So unless the victim, with actual knowledge of the danger, intentionally fails to act in the protection of his or her own interests or is heedlessly indifferent to them, there is no duty to mitigate an intentional tort. *See id.* We adopt the law stated in *Morgan* and the Restatement.

¶ 30. We also reject Russell and Buske's arguments to the extent they purport to say that S.C. Johnson had actual knowledge. The trial court here examined Buske and Russell's three groupings of evidence of S.C. Johnson's knowledge and concluded that, at best, the evidence showed a negligent failure to investigate, which would fall into the Restatement's category of the merely "careless or stupid person" who is protected from the consequences of his or her acts. First, the trial court concluded that evidence of S.C. Johnson's inadequate performance or supervision of Morris displayed only poor judgment for not looking into the high transportation costs. Second, the trial court reasoned that evidence of a third S.C. Johnson employee's receipt of inappropriate gifts and gratuities merely placed that person in a group with Morris and Scheller, as the employee never told S.C. Johnson about the gifts. And finally, the letter from one of S.C. Johnson's former transportation companies, which was dropped from service when the kickbacks scheme began, was merely a plea for an explanation why the company was terminated. Thus the trial court held that the evidence proffered to support S.C. Johnson's failure to mitigate did not prove that S.C. Johnson had actual knowledge and it therefore held the evidence to be irrelevant and inadmissible. We uphold this determination.

### Doubling WOCCA[3] Damages

¶ 31. The third and final novel issue Russell and Buske raise is whether the entire damage should be doubled under WOCCA or if only that portion of a damage verdict attributable to a violation of WOCCA is

---

[3] Again, WOCCA is the acronym for the Wisconsin Organized Crime Control Act.

doubled. Russell and Buske assert the latter because the intent of WOCCA was to create a penal statute, which must be strictly construed. And they purport that, because it is impossible to determine which part of the verdict pertained to the WOCCA violation, none of the verdict should be doubled.

¶ 32. The intent of WOCCA, as explicitly stated in Wis. Stat. § 946.81,

> is to impose sanctions against this subversion of the economy by organized criminal elements and to provide compensation to private persons injured thereby. It is not the intent of the legislature that isolated incidents of misdemeanor conduct be prosecuted under this act, but only an interrelated pattern of criminal activity the motive or effect of which is to derive pecuniary gain.

So as the intent of the entire WOCCA statute illustrates, WOCCA, like its federal counterpart the Racketeer Influenced and Corrupt Organizations Act (RICO), has both penal and remedial purposes; its intent is both to sanction and to compensate.

██

¶ 33. Where statutes are both penal and remedial, courts separate the penal provisions from the remedial, giving the provisions establishing penalties strict construction and the remainder of the act a liberal construction. *City of Madison v. Hyland, Hall & Co.*, 73 Wis. 2d 364, 373, 243 N.W.2d 422 (1976). The specific provision providing multiple damages for persons injured by a violation of WOCCA is Wis. Stat. § 946.87(4). Section 946.87(4) reads in relevant part:

> Any person who is injured by reason of any violation of [WOCCA] has a cause of action for 2 times the actual damages sustained and, when appropriate, punitive damages.

¶ 34. The multiple damages provision in WOCCA is very similar to its federal counterpart in RICO,[4] which the United States Supreme Court has repeatedly acknowledged is remedial:

> Any person injured in his [or her] business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he [or she] sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964(c); *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003) (acknowledging that the multiple damages provision contained in RICO is remedial in nature). That provision of RICO is remedial because it is "designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees." *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 151 (1987). As we stated earlier in our opinion, WOCCA has both a penal and a civil cause of action component. The penal feature is strictly construed. The civil cause of action feature is liberally construed. The damages incurred as a result of this conspiracy all fall under WOCCA. No damages given by the jury fell outside WOCCA, contrary to the claim by Russell and Buske. Therefore, all the damages from the conspiracy were properly doubled. We confirm the trial court's award of double damages on the whole award pursuant to WIS. STAT. § 946.87(4).

---

[4] *See State v. Mueller*, 201 Wis. 2d 121, 144, 549 N.W.2d 455 (Ct. App. 1996) ("[C]ase law interpreting [RICO] is persuasive authority when we interpret WOCCA.").

### Nonmeritorious Issues

¶ 35. Now we get to the issues that have little merit. Russell and Buske contend that the verdict should be set aside and a new trial granted because (1) the verdict is perverse as a result of passion and prejudice, (2) the verdict is fatally defective because the conspiracies were separate, (3) the trial court admitted affidavits with inadmissible hearsay, (4) the trial court admitted hearsay evidence of nonparty carriers, (5) the trial court gave a "draconian spoliation instruction," and (6) it is required in the interest of justice.

### 1. Whether there was a Perverse Jury Verdict

¶ 36. The jury returned a verdict finding that total damages were $147 million. Russell and Buske filed a postverdict motion asserting that the jury's verdict was perverse. At bottom, they argued that the jury's verdict was well above S.C. Johnson's damage expert's estimate, which was the only evidence of the amount of damages. The trial court concluded that the verdict was excessive, though not perverse. So the trial court reduced the verdict to the amount supported by the evidence, which was the $101.9 million estimate from S.C. Johnson's damages expert. S.C. Johnson accepted this amount on remittitur, in lieu of a new trial. Russell and Buske contend that, despite the trial court's ruling to the contrary, the verdict is perverse, not supported by the evidence, and still excessive.

██ ██
¶ 37. When reviewing a trial court's ruling that a verdict is not perverse, this court defers to the trial court's decision because it is in a better position to determine whether perversity permeated the verdict. *See Redepenning v. Dore*, 56 Wis. 2d 129, 134, 201

N.W.2d 580 (1972). And we must sustain the jury's verdict if it is supported by any credible evidence. *See Nieuwendorp v. American Family Ins. Co.*, 191 Wis. 2d 462, 472, 529 N.W.2d 594 (1995).

¶ 38. The trial court's bench decision shows that it analyzed the evidence in light of the defendants' motions after verdict. The trial court explained that "to the extent that there may have been such confusion on the jury's part, the only thing that it would have affected would have been the amount of its award." We agree; excessiveness alone does not establish perversity, *Redepenning*, 56 Wis. 2d at 134, and the allegedly prejudicial evidence Buske and Russell point to is dwarfed by the overwhelming evidence against them. The trial court also determined that $101.9 million was the proper figure because "the jury intended to award anything that it could, which was reasonably supported by the evidence, and that would be the top amount estimated by [S.C. Johnson's expert]." We agree again; $101.9 million is supported by S.C. Johnson's expert's estimate.

### 2. Whether the Verdict is Fatally Defective

¶ 39. Russell and Buske next assert that the only evidence in the case showed three separate conspiracies in existence, not one overarching conspiracy. Yet, the jury was asked to and did assess damages as if there was one, and only one, grand conspiracy. Thus, they claim, the verdict was fatally defective in that it did not conform to the evidence.

¶ 40. This is the same assertion that Russell and Buske made in their postverdict motions, an assertion

that the trial court rejected. Neither Russell nor Buske have explained *why* the evidence would not have allowed the jury to *infer,* from the evidence, that there was one, overarching conspiracy. The law is that juries are allowed to draw reasonable inferences from the facts. *See Nieuwendorp*, 191 Wis. 2d at 472. The trial court found just that. It reviewed the evidence at trial and determined that "the conspiracies are interrelated with Mr. Morris [the S.C. Johnson employee] as the common person in all of them and that they were all intended to achieve a common goal." And the trial court further concluded that "all of the acts that [Morris] did, regardless of in which of the conspiracies they may be assigned, were for the benefit of all of the conspiracies." The evidence allowed the jury to infer that, had Morris not involved all carriers in the conspiracy, paying the same inflated rates to all of them, he risked detection of his bribery scheme. The evidence also shows that each player knew that the other carriers were also players in the grand scheme. It is not like they had to be in the same smoke filled room counting their money while keeping their eye on each other. Rather, as the trial court reasoned, each conspirator "ma[d]e it possible to accomplish the goal or objective of the conspiracy."

### 3. Admission of Affidavits

██ ██

¶ 41. Over Russell and Buske's objection, the trial court admitted into evidence portions of redacted affidavits from the reports of two federal government law enforcement agents. The affidavits described a similar conspiracy between Buske and a transportation employee from a different corporation. The trial court allowed them into evidence under the public records or reports exception to the hearsay rule. *See* Wis. Stat.

§ 908.03(8). We will affirm the decision to admit evidence absent a showing that the trial court erroneously exercised its discretion. *Sullivan v. Waukesha County*, 218 Wis. 2d 458, 470, 578 N.W.2d 596 (1998).

¶ 42. Buske asserts the affidavits are inadmissible because they lack trustworthiness since the federal investigators' sources were unknown and parts are hearsay within hearsay.[5] As to the hearsay within hearsay, the trial court redacted all of the portions that are solely the report of what a third party had said to the investigator. And as to their trustworthiness, the trial court explained that the federal investigator's factual findings are admissible, including the conclusions and statements of the investigator, as an exception to the hearsay rule under WIS. STAT. § 908.03(8), and the affidavits had "considerable trustworthiness." This is correct. There is a circumstantial guarantee of trustworthiness for a public agency report containing matters observed pursuant to a duty imposed on that agency by law. *See id.* Beyond the obvious fact that the reports are hearsay, since the agents did not testify in court, Russell and Buske point to no evidence or circumstances that would indicate a lack of trustworthiness. We therefore affirm.

---

[5] Buske also vehemently argues that the reports are inadmissible because a third person, with no personal knowledge, and who was a former FBI agent, read the reports into evidence. He contends that this reading likely made the jury think the former FBI agent was speaking on the government's behalf. But we have searched the record and found no objection at trial to the former FBI agent as a witness or to that agent reading the reports. So that argument is waived. *See Hopper v. City of Madison*, 79 Wis. 2d 120, 137, 256 N.W.2d 139 (1977).

### 4. Admission of Bad Acts Evidence of Nonparty Carriers

¶ 43. Buske argues that the trial court admitted prejudicial, irrelevant evidence of the bad acts of non-party carriers and, as a result, a new trial is warranted. The problem with this argument is that Buske supports it by pointing to only a handful of pages in a record that spans thousands of pages and in that handful of pages Buske raised only one relevancy objection. Buske was obligated to first object at trial to the admission of evidence if he thought it was irrelevant bad acts evidence and then on appeal to identify those specific objections. *See Keplin v. Hardware Mut. Cas. Co.*, 24 Wis. 2d 319, 332, 129 N.W.2d 321 (1964) (court will not consider arguments that do not identify specific questions, objections and rulings).

¶ 44. The one piece of evidence Buske points out that he did object to on relevance grounds was relevant. This piece of evidence was testimony that a nonparty carrier hired Scheller's friend. Later the testimony revealed that the purpose of hiring Scheller's friend was to get S.C. Johnson's business. We agree with the trial court that this evidence was relevant because it tended to establish a pattern of breaches of fiduciary duty and continued racketeering activity. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240–41 (1989) (evidence that RICO defendant was involved in other similar schemes with different parties was relevant to establish a pattern of racketeering activity). Moreover, that single piece of evidence is not so prejudicial that it warrants a new trial.

### 5. Spoliation Instruction

■■

¶ 45. The next issue is whether the trial court erroneously exercised its discretion in finding that Russell destroyed evidence and in imposing its spoliation instruction. *See Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI App 15, ¶ 14, 269 Wis. 2d 286, 674 N.W.2d 886, *affirmed*, 2004 WI 139, 276 Wis. 2d 361, 688 N.W.2d 462 (decision to impose sanctions for destruction or spoliation of evidence is within the sound discretion of the trial court). After hearing Russell's proffered testimony on certain missing bank account ledgers, the trial court held that "clear and convincing evidence, almost overwhelming inference to be drawn that the original[s] of the records were intentionally destroyed at some point in time when their importance and significance to contemplated or pending litigation would have been known." So the court gave the following spoliation instruction to the jury:

> S.C. Johnson requested registers from Tom Russell and his companies regarding the T.R. Russell and Associates business savings account. The Court has ruled that the defendant Tom Russell intentionally destroyed the original registers and has offered no explanation for their destruction.
>
> You may but are not required to infer that Mr. Russell destroyed those original records because producing them to S.C. Johnson would have been harmful to the Russell Defendants' interests.

On appeal Russell asserts that the evidence of deliberate destruction was only speculation and innuendo and that the evidence did not support that he destroyed them after he was notified of S.C. Johnson's potential legal action.

795

¶ 46. The destruction, alteration, or loss of evidence may qualify as spoliation depending on whether "the party responsible for the destruction of evidence knew, or should have known, at the time it destroyed the evidence that litigation was a distinct possibility, but also whether the offending party destroyed documents which it knew, or should have known, would constitute evidence relevant to the pending or potential litigation." *Id.*, ¶ 15.

¶ 47. Our review of the evidence showed that the only straight answer Russell gave in response to the questions on the missing ledgers were that he did not know why they were missing, except that he must have lost them at some point. Weaved into his testimony were several inconsistent statements about why he lacked documentation of the account transactions. An adverse inference may be inferred from Russell's answers, or lack thereof, and his nonproduction of the ledgers. *See Graystone Nash*, 25 F.3d at 191. The trial court concluded that Russell must have destroyed the missing ledgers when it became clear they would be important to S.C. Johnson's litigation. Though Russell wants us to reach a different conclusion, he has not met his burden of proving why the trial court's inference was unreasonable.

### 6. New Trial in the Interest of Justice

¶ 48. Finally, both Russell and Buske make a plea for a new trial in the interest of justice. They claim a new trial is warranted based on the cumulative effect of trial errors. *See State v. Albright*, 98 Wis. 2d 663, 677, 298 N.W.2d 196 (Ct. App. 1980). But their plea is a repeat of the arguments earlier made, which we have

rejected. A new trial is unwarranted. *See Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976). We affirm.

*By the Court.*—Order affirmed; attorneys sanctioned.