#25327-aff in pt, rev in pt & rem-DG

**2011 S.D. 9**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

WESTERN CONSOLIDATED
COOPERATIVE,                                    Plaintiff and Appellee,
          v.
LYNN PEW AND LYNETTE PEW,             Defendants,
          and
LABOLT FARMERS GRAIN COMPANY,    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA

* * * *

HONORABLE ROBERT L. TIMM
Judge

* * * *

RICHARD L. RUSSMAN
KIMBERLY A. DORSETT of
Richardson, Wyly, Wise,
  Sauck & Hieb, LLP
Aberdeen, South Dakota                    Attorneys for plaintiff
                                                        and appellee.


GREG L. PETERSON
MELISSA E. NEVILLE of
Bantz, Gosch & Cremer, LLC
Aberdeen, South Dakota                    Attorneys for defendant
                                                        and appellant.

* * * *

ARGUED FEBRUARY 17, 2010

OPINION FILED **03/09/11**

GILBERTSON, Chief Justice

[¶1.]        Western Consolidated Cooperative (WestCon) sued Lynn Pew for conversion of grain he stole and sold to LaBolt Farmers Grain Company (LaBolt). WestCon also sued LaBolt for conversion for its role in purchasing the stolen grain from Pew.  After discovery, WestCon's motion for summary judgment was granted and the circuit court ordered judgment jointly and severally against Pew and LaBolt.  LaBolt appeals, arguing that its lack of knowledge about Pew's theft provided it with a defense against liability, or in the alternative, served to reduce proportionally its share of the damages payable to WestCon.  LaBolt also argues that WestCon failed to mitigate its damages.  We affirm in part and reverse in part and remand.

## FACTS

[¶2.]        WestCon is a Minnesota cooperative with a grain elevator in Milbank, South Dakota.  WestCon purchased the grain elevator from Harvest States in January 2003.  In the final three years Harvest States owned the elevator, it employed Pew on a contract basis to be its lead grain hauler.  Pew would make one or more trips from the elevator a day using his own semi-truck.  When the elevator was sold to WestCon, Pew lost that job because WestCon had its own truckers.  Pew never worked for the grain elevator after ownership was assumed by WestCon.

[¶3.]        Beginning in mid-January 2003, after the sale to WestCon, and through January 2005, Pew surreptitiously stole grain from the WestCon grain elevator one truckload at a time and sold it in his name.  Pew was able to steal the grain during the early morning hours when the elevator was unattended.  Pew

testified that when he stole the grain he would pull up to the elevator early in the morning around 5:30 a.m., fill his semi-truck, and leave. Given his prior relationship with Harvest States, the sight of Pew filling his semi-truck with grain was nothing out of the ordinary. Also due to that relationship, Pew was skilled at loading his semi-truck from the storage facility. Pew testified he could fill his semi-truck in a few minutes and be on his way.

[¶4.] Pew stated he found the grain elevator unlocked all but about a dozen times during the two years he stole grain.[1] By the time Pew was apprehended, the shortage totaled 89,000 bushels taken in approximately 100 loads during the two-year period he perpetrated the thefts. By taking the grain one truckload at a time (approximately 950 bushels per truckload), during this two-year time period, Pew was able to avoid alerting WestCon to outside theft as the source of its losses.

[¶5.] WestCon became aware of shortages at its Milbank facility in January 2003. Chad Syltie, WestCon's credit manager who was assigned the task of determining the cause of the shortages, originally thought it was due to shrinkage or a miscount until March 2003 when the shortage grew to an estimated 22,000 bushels of grain. Early in the two-year scheme, WestCon did not identify outside theft as the source of the shortages because of the amount taken each time and

---

1. Pew's deposition given in Federal Prison is inconsistent on this point. He initially said the silo was never locked. Pew then contradicted this earlier statement by saying it was locked occasionally. He later offered a third version by saying it was locked only twelve times when he attempted to steal grain. Recognizing this, LaBolt conceded in its statement of disputed facts that Pew's testimony could not be accepted entirely as a statement of undisputed fact.

because it had standard procedures in place to detect such thefts. Those policies were, according to Syltie's testimony, common for area silos.

[¶6.] WestCon's theft and shortage detection procedures included conducting a physical inventory each month and locking the gravity chutes on its two silos. It also maintained a running total for the grain in the silos using daily computer-generated position reports based on daily purchases and outbound shipments. Because grain has a shrinkage factor of two-to-three percent at any given time, the shortages in the first three months did not alert WestCon to any irregularities.

[¶7.] Once WestCon's management realized shrinkage was not the source of the shortages, its next theory was that the inventory it purchased in January 2003 from Harvest States was either miscalculated or understated. Over the course of a few months, Syltie was able to verify that Harvest States had measured its inventory correctly before the time of the sale and that no understatement had occurred.

[¶8.] On May 5, 2003, Mick Johnson, WestCon's manager, reported the shortage to the Milbank Police Department during an investigation into an unrelated break-in of WestCon's office area. According to Police Chief Tim Kwasniewski, Johnson laid out a scenario similar to the one used by Pew in which Johnson theorized that the grain could be stolen one truckload at a time using the gravity fed chutes on the silos. According to Kwasniewski, Johnson stated that all the thief would need was the key to the padlock on the silo chutes. Kwasniewski would later attest that it was his impression that Johnson suspected something criminal in nature was occurring. Kwasniewski agreed to have patrol cars make

additional checks on the WestCon elevator after hours. Kwasniewski's affidavit did not identify whether Johnson suspected an internal or external thief was at work. However, according to Syltie's testimony, WestCon still continued to suspect employee theft or fraud as of May 2003. As a result, WestCon did not request additional police intervention. Instead, it continued to direct employees to lock the silo chutes at night.

[¶9.] Syltie next focused his investigation on an employee who had transitioned from Harvest States to WestCon after the sale and then abruptly quit a few months later. That employee's background, work, and role at the facility were investigated. However, the employee was found to have no role in the shortages. Other employees were also considered during the on-going investigation, but none were determined to be involved.

[¶10.] WestCon subsequently theorized that perhaps one or more of its customers were either miscalculating or purposely understating inbound loads. When that did not provide any answers, WestCon investigated its outbound truckers who transported all of its grain from Milbank to Minnesota for loading onto railcars. Again, no thefts or discrepancies were found.

[¶11.] All of WestCon's efforts to ascertain the source of the shortages were unsuccessful and each took several months to resolve. WestCon did not originally consider an outside thief due to the location of the Milbank facility. The elevator, located inside city limits, had no history of prior thefts according to Harvest States. As Syltie testified: "[they had] never [had] a theft like this before, and it took everyone by surprise." He also testified that he was unaware of any other security

measures taken by other elevators in the area to protect against this kind of loss apart from those utilized by WestCon.

[¶12.]    Finally, after the elimination of the other possible causes of the shortages, WestCon concluded in summer 2004 that the source of the losses was likely a thief external to its operation. Thereafter, WestCon changed the locks on the silos on a monthly basis. When the shortages continued to mount, it changed the locks weekly in November and early December.[2] In fall 2004, WestCon contacted the police department to conduct still camera surveillance. In early December, the police department's camera photographed a suspect. However, the camera was not at the right angle to identify the thief. WestCon changed the locks once again and the camera was repositioned.

[¶13.]    On January 10 and January 18, 2005, Pew was caught on camera loading grain. Pew was apprehended in the process of accessing the elevator for a third time on January 19, 2005. Pew was charged criminally in federal court and eventually pleaded guilty.[3]

[¶14.]    WestCon's total losses were estimated at $726,000. Defendant LaBolt purchased 82,370.87 bushels of WestCon grain from Pew between March 1, 2003,

---

2.    Pew claimed, however, the locks were not always locked. *See supra* n.1. Syltie also testified that Pew used a wrench to remove the locking mechanism from the chutes rather than tampering with the locks.

3.    Pew pleaded guilty in United States District Court for the District of South Dakota to one count of violating 18 U.S.C. § 1341, obtaining property by fraud or false pretense and using the United States Post Office for the purpose of effecting the scheme. He was serving his sentence at the Federal Prison Camp in Duluth, Minnesota, at the time of this appeal.

and December 7, 2004. LaBolt's check register for this period showed it paid Pew $424,334.05 for the grain. LaBolt did not inquire as to the ownership of the grain sold by Pew. LaBolt also had no way of knowing to whom the grain belonged at the time of purchase.

[¶15.] In addition to the 82,370.87 bushels sold to LaBolt, Pew estimated that he sold 30% of all the WestCon grain he stole to Wheaton-Dumont, and 10,500 bushels of stolen corn to Northern Lights Ethanol, LLC. In addition, David Hanson, a friend of Pew's and his part-time employer, reported a shortage of 9,000 bushels of grain from his silos to the Milbank police. Hanson suspected Pew had stolen the grain while working on Hanson's property.

[¶16.] Upon Pew's arrest, WestCon recovered $51,093.36 in soybeans from LaBolt's facility. WestCon also recovered a cashier's check for $6,850 for stolen grain sold by Pew. In addition, WestCon recovered various items of personal property from Pew and his wife, Lynette Pew, valued at approximately $85,255.

[¶17.] WestCon sued Pew for conversion of the grain. WestCon moved to join LaBolt and Lynette Pew. WestCon amended its complaint to allege LaBolt was liable to WestCon for conversion by purchasing WestCon's grain from Pew. WestCon also claimed that Lynette Pew was liable to WestCon for conversion because she retained proceeds from the sale of stolen grain. LaBolt filed a cross-claim against Pew and Lynette Pew for indemnity and contribution.

[¶18.] WestCon moved for summary judgment against all defendants. LaBolt objected and asserted genuine issues of material fact existed on the issue of damages and LaBolt's defenses. After a hearing, the circuit court ordered summary

judgment in favor of WestCon against LaBolt and Pew jointly and severally in the

amount of $424,334.05. The circuit court also ordered $143,198.36 as a credit

against the judgment, or other sums as the parties might agree or as might be

determined by the circuit court for property and money previously recovered by

WestCon. LaBolt appeals, raising three issues:

1. Is there a genuine issue of material fact as to whether LaBolt's interference was "unwarranted."

2. Is there a genuine issue of material fact as to LaBolt's proportion of fault for purposes of applying the Uniform Contribution Among Tortfeasors Act, SDCL 15-8-15, -15.1, and -15.2.

3. Are there genuine issues of material fact as to the amount of damages WestCon may be entitled to recover.

## STANDARD OF REVIEW

[¶19.] Our standard of review for a motion for summary judgment is

settled.

> Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.

*Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 16, 757 N.W.2d 756, 761-62 (quoting

*Mueller v. Cedar Shores Resort, Inc.*, 2002 S.D. 38, ¶ 10, 643 N.W.2d 56, 62).

Furthermore,

> [w]hile we often distinguish between the moving and non-moving party in referring to the parties' summary judgment

> burdens, the more precise inquiry looks to who will carry the burden of proof on the claim or defense at trial. Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*De Smet Farm Mut. Ins. Co. of S.D. v. Gulbranson Dev. Co., Inc.*, 2010 S.D. 15, ¶ 16, 779 N.W.2d 148, 155 (quoting *Zephier v. Catholic Diocese of Sioux Falls*, 2008 S.D. 56, ¶ 6, 752 N.W.2d 658, 662-63).

[¶20.]     Statutory interpretation is an issue of law that this Court reviews under the de novo standard. *Discover Bank*, 2008 S.D. 111, ¶ 15, 757 N.W.2d at 761 (citing *Martinmaas v. Engelmann,* 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611). The true intention of the law is ascertained primarily from the language in the statute. *Id*. "When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *Id*.

## ANALYSIS AND DECISION

[¶21.]     **1.     Is there a genuine issue of material fact as to whether LaBolt's interference was "unwarranted."**

[¶22.]     "Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right." *First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton*, 2008 S.D. 83, ¶ 38, 756 N.W.2d 19, 31 (quoting *Chem-Age Indus., Inc. v. Glover,* 2002 S.D. 122, ¶ 20, 652 N.W.2d 756, 766). In *Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 271 (S.D. 1986), we quoted

*Poggi v. Scott,* 167 Cal. 372, 375, 139 P. 815, 816 (1914), for the following proposition:

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the *unwarranted* interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.

(Emphasis added.) Furthermore, in order to prove conversion, the plaintiff must show

> (1) [plaintiff] owned or had a possessory interest in the property; (2) [plaintiff's] interest in the property was greater than the [defendant's]; (3) [defendant] exercised dominion or control over or seriously interfered with [plaintiff's] interest in the property; and (4) such conduct deprived [plaintiff] of its interest in the property.

*First Am. Bank & Trust, N.A.*, 2008 S.D. 83, ¶ 38, 756 N.W.2d at 31.

## A. LaBolt argues there is evidence questioning WestCon's ownership of the grain.

[¶23.] LaBolt argues that there is evidence questioning whether all the grain it purchased from Pew belonged to WestCon. There is some evidence that Pew may have stolen 9,000 bushels of grain from his part-time employer, Hanson. However, there is no evidence that Hanson's grain, if converted by Pew, was purchased by LaBolt.

[¶24.] WestCon offered LaBolt's check register as an exhibit showing it paid Pew $424,334.05 for grain delivered by Pew. It was undisputed that Pew did not farm and had no grain to sell. Pew testified that all the grain he sold was stolen from WestCon.

[¶25.]    LaBolt objected to WestCon's statement of undisputed facts that LaBolt had purchased $424,334.05 in grain stolen exclusively from WestCon. LaBolt, however, did not include in its statement of disputed facts any allegation as to the ownership of the $424,334.05 in grain it purchased. At best, LaBolt suggested it may have purchased some or all of the 9,000 bushels of grain Hanson reported might have been stolen by Pew. LaBolt admitted in its statement of disputed facts that it had "no evidence that the grain was owned by anyone else."

[¶26.]    Offering only argument while failing to offer contradictory evidence cannot defeat a prima facie showing by a plaintiff. *Fin-Ag, Inc. v. Pipestone Livestock Auction Mkt., Inc.*, 2008 S.D. 48, ¶ 37, 754 N.W.2d 29, 44. LaBolt failed to offer anything other than argument as to the ownership of the grain it purchased. WestCon provided evidence and testimony sufficient to make a prima facie showing that LaBolt converted $424,334.05 of the $726,000 in grain Pew stole from WestCon. The prima facie showing by WestCon went unrebutted by LaBolt.

**B.    Whether LaBolt's control over the grain was "wrongful" or "unwarranted."**

[¶27.]    LaBolt next argues that the language in SDCL 21-3-3 only permits damages for *wrongful* conversion. It further contends that the circuit court did not make a specific determination that LaBolt's control over the grain was wrongful. WestCon asserts that LaBolt misapplies the law of conversion in that there is no good faith defense to conversion as it is by definition "wrongful" under SDCL 21-3-3.

[¶28.]      SDCL 21-3-3 provides how damages for conversion are calculated:

> The detriment caused by the *wrongful* conversion of personal property is presumed to be:
>
> (1)      The value of the property at the time of the conversion, with the interest from that time;
> (2)      Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party;
> (3)      A fair compensation for the time and money properly expended in pursuit of the property.
>
> Such presumptions cannot be repelled in favor of one whose possession was wrongful from the beginning by his subsequent application of the property to the benefit of the owner, without his consent.

(Emphasis added.)[4]

[¶29.]      LaBolt argues that the use of the word *wrongful* in SDCL 21-3-3 required WestCon to show that LaBolt's possession of the grain was wrongful or unwarranted. LaBolt further contends that it occupied the position of a good faith purchaser for value without knowledge or notice of WestCon's rights in the grain. As such, LaBolt argues that it was a question for the jury whether LaBolt's status limited liability or limited damages.

[¶30.]      Our case law is clear that it is immaterial that a defendant who purchases goods from a seller who has converted those goods "had neither knowledge nor notice that the [seller] was committing a wrong by the sale." *Fin-Ag, Inc.*, 2008 S.D. 48, ¶ 34, 754 N.W.2d at 44 (*citing Sanborn Cnty. Bank, Inc. v.*

---

4.      This has consistently been the law in this jurisdiction since its inception. Dakota Revised Civil Code §§ 1970-1971 (1877).

*Magness Livestock Exch., Inc.*, 410 N.W.2d 565, 567 (S.D. 1987)). All that is required for a defendant/purchaser to be liable for conversion is that the defendant/purchaser exercised control or dominion over the personal property of another in a way that repudiated the other's rights in the property or in a manner inconsistent with such rights. *Id.* The tort of conversion does not require the intent to deprive the true owner of his property rights. *Rensch*, 393 N.W.2d at 271 ("Intent or purpose to do a wrong is not a necessary element of proof to establish conversion."). "It is immaterial that the agent had neither knowledge nor notice that the principal was committing a wrong by the sale." *Fin-Ag, Inc.,* 2008 S.D. 48, ¶ 34, 754 N.W.2d at 44. The use of the word "wrongful" in SDCL 21-3-3 does not add an element to the tort, or an additional element that must be satisfied in order to calculate damages once the defendant has been found liable for conversion. It is the act of conversion itself that is the wrong. *Id.* Thus, the language of the statute and its subsequent interpretative case law holds that as between the owner and the subsequent purchaser from the thief, the subsequent purchaser is to bear the consequences of the loss, not the original owner.

[¶31.]      **2.     Is there a genuine issue of material fact as to LaBolt's proportion of fault for purposes of applying the Uniform Contribution Among Tortfeasors Act, SDCL 15-8-15, -15.1, and -15.2.**

[¶32.]      LaBolt next argues that there is a genuine issue of material fact as to LaBolt's proportion of fault. LaBolt further asserts that because it did not act in concert with Pew to convert the grain, WestCon must show that LaBolt engaged in "wrongful conversion" before WestCon can recover damages from LaBolt. LaBolt

bases its argument on SDCL 21-3-3, which it again contends permits damages only for *wrongful* conversion.

[¶33.]     SDCL 15-8-15 provides: "When there is such a disproportion of fault among joint tort-feasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tort-feasors shall be considered in determining their pro rata shares." SDCL 15-8-15.1 provides:

> If the court enters judgment against any party liable on the basis of joint and several liability, any party who is allocated less than fifty percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party.

SDCL 15-8-15.2 provides:

> In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. The trier of fact may determine that two or more persons are to be treated as a single party if their conduct was a proximate cause of the damages claimed and if the acts or omissions of such persons are so interrelated that it would be inequitable to distinguish between them.

[¶34.]     As this Court has often noted:

> The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed.

*Discover Bank*, 2008 S.D. 111, ¶ 15, 757 N.W.2d at 761.

[¶35.]     In order to impose joint and several liabilities upon the defendants, the circuit court was required under SDCL 15-8-15.1 and -15.2 to have the trier of fact determine LaBolt's percentage of fault, or to determine that LaBolt and Pew were to be treated as a single party.  If the trier of fact determines that LaBolt and Pew are to be treated as a single party under SDCL 15-8-15.2, their respective conduct must be "so interrelated that it would be inequitable to distinguish between them."  If the trier of fact finds that the conduct of LaBolt and Pew are not so interrelated as to be able to distinguish between their respective conduct, then a percentage allocation of fault must be entered for each defendant by the trier of fact.  Any defendant who is found by the trier of fact to be responsible for "less than fifty percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party."

[¶36.]     WestCon's motion for summary judgment on the issue of damages was improperly entered.  There is a genuine issue of material fact for the trier of fact regarding the percentage of fault that could be allocated to each defendant under SDCL 15-8-15.1 and -15.2.  That portion of the order is vacated and the matter remanded to the circuit court for the trier of fact to determine the percentage of fault for each defendant, and entry of a new order on the issue of damages in compliance with those two statutory provisions.

[¶37.]     **3.     Are there genuine issues of material fact as to the amount of damages WestCon may be entitled to recover.**

[¶38.]     LaBolt again states that there are genuine issues of material fact regarding whose grain Pew stole and to whom it was sold, this time in an effort to argue that WestCon's damages were not "reasonably certain."  However, this

argument was not presented to the circuit court below and is deemed waived. *See State v. Engesser*, 2003 S.D. 47, ¶ 32, 661 N.W.2d 739, 750.

[¶39.] LaBolt's argument that WestCon failed to mitigate its damages was preserved below. LaBolt, citing Restatement (Second) Torts § 918(1)(1979), argues that WestCon failed to make reasonable efforts and expenditures to prevent its own losses. It argued before the circuit court that WestCon failed to take effective action to mitigate its damages at the time WestCon first suspected or became aware of the shortages in March 2003. WestCon countered that it was not required to mitigate until it discovered Pew was stealing grain in late December 2004 and early January 2005.

[¶40.] The circuit court disallowed the defense rather than finding there were disputed issues of material fact. The question before this Court is a legal one rather than a factual dispute. At issue is whether the mitigation of damages rule applies under the facts of this case. This is not a question of common law; it is one of statutory construction as it is controlled by SDCL 21-3-3, which has been in effect in this jurisdiction since 1877. Dakota Revised Civil Code §§ 1970, 1971 (1877). As such, the statute and its interpretative case law are what control the resolution of this issue.

[¶41.] Under SDCL 21-3-3 and its interpretative case law, WestCon is the victim of an on-going conversion by continual theft and is not required to anticipate that the theft will continue into the future. Even under an opposite legal conclusion that this is a series of individual thefts, the result is the same.

[¶42.] A review of our case law shows that application of the doctrine of mitigation to conversion of a plaintiff's property is very limited and, in those few circumstances where allowed, only recognized after the injury occurs. In the case of *Rosum v. Hodges*, 1 S.D. 308, 47 N.W. 140 (1890), this Court in its initial interpretation of SDCL 21-3-3 made a passing reference to a victim's potential negligence. *Id.* at 142. However, this Court refined its analysis to recognize the unequivocal protection of the property rights of the victim unless he had qualified his right to the property or his right of immediate possession.[5] *Id.* Thus, the Court concluded that if the owner's property right was established, no further mitigation defenses were recognized. This Court once again addressed the mitigation issue in a conversion action in *Stone v. Chicago, M & St. P. Ry. Co.*, 3 S.D. 330, 53 N.W. 189 (1892). Therein we held that the victim of a conversion was limited to recoverable damages "commensurate with his actual loss . . . and any facts which, if established by proof, will go toward a mitigation of damages, are competent evidence in a trial

---

5. The Court reasoned:

> Upon principle, it is not easy to give a satisfactory reason why the true owner, who has been guilty of no wrong or negligence, should be prejudiced by a transaction between the wrongful taker of his property and a third person, or how such a transaction can impose upon him a new obligation. Having been guilty of no act impairing, or in any manner qualifying, either his right of property or his right of immediate possession, he may assert such right whenever and wherever he finds his property.

*Rosum*, 47 N.W. at 142.

of an action of trover or conversion." *Id.* at 191 (citations omitted). No additional mitigation theories were recognized as a defense.

[¶43.]      Another claim for mitigation was rejected by this Court in *Arneson v. Nerger*, 34 S.D. 201, 147 N.W. 982 (1914). In *Arneson*, the defendant sought to diminish the claim for damages by tendering the disputed stock with the court after suit was initiated. *Id.* at 983. This Court observed that, "[a]fter the conversion of property has become complete, the wrongdoer cannot escape liability nor lessen the actual damage recoverable, by a tender back of the property." *Id.* (quoting *Dooley v. Gladiator Consol. Gold Mines & Milling Co.*, 134 Iowa 468, 109 N.W. 864 (1906)).

[¶44.]      LaBolt relies heavily upon *Security State Bank v. Benning*, 433 N.W.2d 232 (S.D. 1988), to support its thesis. However, LaBolt fails to acknowledge our limiting statement in *Security State Bank* that "[t]*his rule does not require respondent to anticipate the injury before it occurs but rather relates to an act or omission relating to the injury after it occurs.*" *Id.* at 235 (emphasis all original).

[¶45.]      This observation is taken from a more in-depth analysis of the mitigation issue in *Chicago, Burlington & Quincy R.R. Co. v. Wheaton*, 76 S.D. 467, 80 N.W.2d 868 (1957). There, the appellant built a dam that used the railroad right-of-way as a wall. *Id.* As time went on, the water had a deteriorating effect and weakened the railroad grade. *Id.* The dam ultimately burst due to high water and caused substantial damage to the grade. *Id.* The appellant argued that the railroad should have been aware of the existence of the dam and taken some affirmative action to mitigate its on-going damages from the water. *Id.* at 870. We rejected such a contention, noting that "It would seem to us that the duty to take

the . . . action that appellant claims respondent should have taken would primarily lie with appellant whose continuous trespass was the underlying cause of the injury to respondent's property." *Id.* at 870-71. While acknowledging the victim did have a duty to eliminate the injury and prevent further damages, we concluded that such a mitigation defense "does not require respondent to anticipate the injury *before* it occurs but rather relates to an act or omission relating to the injury *after* it occurs." *Id.* at 871 (emphasis added).

[¶46.] Based on what case law we have, the facts of this case constitute a single on-going conversion, rather than a series of conversions. Therefore, under the cases cited above, the doctrine of mitigation does not apply. Pew's thefts were part of a continuing plan or scheme, as demonstrated by the identical method he used in every theft and his repeated sale of the stolen grain to LaBolt. Pew's uncontradicted testimony as to how he continually took the grain from WestCon is detailed earlier in this opinion. His method never varied. He always acted alone with the same truck, removing the same item—grain—from the same elevator, in the same amounts, at the same time of day, hauled on the same route directly to LaBolt, and obtained payment in the same manner. Of the 100 loads taken, nothing was unique to distinguish one of the 100 loads from any other. It became such a continual process that when deposed in prison, Pew was not able to differentiate between the various thefts and did not even know the total number of loads he had taken. He had to take the word of the attorneys for WestCon and LaBolt for that figure. Based on our case law, the facts of this case constitute a

single on-going conversion rather than a series of conversions. Therefore, under the cases cited above, a mitigation defense does not apply.

[¶47.] Even if one accepts the contrary premise that this is a series of individual conversions, it still does not mean that an owner of property must clear himself or herself in a contested trial from failure to mitigate damage claims before or while the conversion was occurring. Such a contention has been considered and rejected by the Utah Supreme Court in *Angelos v. First Interstate Bank of Utah*, 671 P.2d 772 (Utah 1983). In *Angelos*, the plaintiff Dr. Angelos sought to recover funds embezzled from him by an assistant over an eleven-year period. 671 P.2d at 774. The office assistant forged Dr. Angelos's signature on patient's checks and deposited them into her personal account at First Interstate Bank (Bank). *Id.* On appeal, the Bank raised the mitigation of damages argument claiming that Dr. Angelos "as a reasonably prudent businessman, knew or reasonably should have known of the embezzlement by [the office assistant] before March of 1975 and before September of 1978." *Id.* at 775. The Utah Supreme Court rejected Bank's mitigation of damages argument on appeal. It held as a matter of law that the eleven-year embezzlement scheme was a series of wrongful acts and not one continuous act as contended by Bank. *Id.* at 777. "Under the doctrine of avoidable consequences [mitigation of damages], 'one need never take steps in advance to avoid the consequences of a future threatened wrong . . . ,' but rather, need only avoid or minimize damages that arise out of a wrong that has already been committed." *Id.* (quoting C. McCormick, *McCormick on Damages* § 37, at 137 (1935)). That court held that under the mitigation of damages rule, Dr. Angelos's failure to discover the

assistant's embezzlement scheme did not preclude him from recovering for the subsequent embezzlement of funds because each act of embezzlement in the scheme was a separate wrongful act. *Id.* As such, the embezzlement of a check earlier in time did not trigger a duty on the part of the victim to stop the subsequent checks from being embezzled or risk a reduction in damages under the mitigation rule. *Id.*

[¶48.]     In 1877, the Territorial Legislature made the decision when conversion occurred that as between an innocent victim and an innocent purchaser, the purchaser should sustain the loss as he could obtain no better title than the seller, who was a thief, possessed. *See* Dakota Revised Civil Code §§ 1970, 1971 (1877).[6] That statute, now codified at SDCL 21-3-3, has never been materially changed.

[¶49.]     LaBolt's argument would in essence alter the doctrine of conversion into a common-law negligence standard. Unless as a victim you were fortunate enough to be a one-time victim, in subsequent acts resulting in further losses you would have to defend yourself against the claim, as stated in *Angelos*, that "as a

---

6.     The Dakota Revised Civil Code § 1970 (1877) provides:

> The detriment caused by the wrongful conversion of personal property is presumed to be:
>> One – The value of the property at the time of the conversion, with the interest from that time; and,
>> Two – A fair compensation for the time and money properly expended in pursuit of the property.

Section 1971 (1877) provides:

> The presumption declared by the last section cannot be repelled, in favor of one whose possession was wrongful from the beginning, by his subsequent application of the property to the benefit of the owner, without his consent.

reasonably prudent businessman, [you] knew or should have known of the embezzlement"— in other words you will have to litigate the issue that you were not contributorily negligent. Instead of promptly recovering your property, you would be forced to run the gauntlet of a jury trial with its delay and expense.

[¶50.]    Further, in *Rensch*, we categorically rejected negligence tort concepts as applied to the conduct of a defendant in a conversion case:

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.

393 N.W.2d at 271. Based on our case law cited above, the same standard should be applicable to the plaintiff in a conversion case.

[¶51.]    SDCL 21-3-3 has never been materially amended and there is no reason to interpret it differently after 133 years. WestCon was not required to mitigate its damages until after it discovered Pew was stealing grain in late December 2004 and early January 2005.[7] Accordingly, the circuit court is affirmed on this issue.

[¶52.]    Affirmed in part, reversed in part, and remanded.

[¶53.]    SEVERSON, Justice, concurs.

---

7.    If LaBolt was claiming that WestCon failed to mitigate damages that occurred after Pew was discovered stealing the grain on camera, the doctrine of mitigation of damages would apply. WestCon's duty to mitigate damages began to apply only after it knew how the grain was being stolen and by whom.

#25327

[¶54.]     ZINTER, Justice, concurs specially in part and concurs in result in part.

[¶55.]     KONENKAMP and MEIERHENRY, Justices, concur in part and dissent in part.


ZINTER, Justice (concurring specially on Issue 2 regarding "contribution among joint tortfeasors," and concurring in result on Issue 3 regarding mitigation).

I

[¶56.]     In Issue 2, the Court discusses "applying the Uniform Contribution among Joint Tortfeasors Act." I concur specially only to point out that we are not applying that act. The Uniform Contribution among Joint Tortfeasors Act (SDCL 15-8-11 to 15-8-15 and 15-8-16 to 15-8-22) is a 1945 enactment[8] regulating the right of contribution *among defendant tortfeasors* who are jointly or severally liable to a plaintiff. On the other hand, SDCL 15-8-15.1 and 15.2, the statutes we apply today, are a 1987 Act[9] regulating when, and to what extent, defendant tortfeasors may be held *jointly and severally liable to a plaintiff*. Although codified together, these statutes were enacted as separate acts and govern different subjects.

[¶57.]     The 1945 Act is South Dakota's version of the 1939 Uniform Contribution Among Tortfeasors Act. *See* 1945 S.D. Sess. Laws. ch. 167; Uniform

---

8.     An act entitled: "An Act Concerning Contribution Among Tortfeasors, Release of Tortfeasors, Procedure Enabling Recovery of Contribution, and Making Uniform the Law with Reference Thereto." 1945 S.D. Sess. Laws. ch. 167, § 2.

9.     An act entitled: "An Act to modify the doctrine of joint and several liability." 1987 S.D. Sess. Laws. ch. 154, §§ 1, 2.

-22-

Contribution Among Tortfeasors Act, 12 U.L.A. 57 *et seq*. (1939). That Act creates

and regulates the right of contribution among "joint tortfeasors." *See* SDCL 15-8-

11, 12, and 15. Joint tortfeasors are defined as "two or more persons *jointly or*

*severally* liable in tort for the same injury to person or property, whether or not

judgment has been recovered against all or some of them." SDCL 15-8-11

(emphasis added). Thus, for the Contribution Among Joint Tortfeasors Act to apply,

there first must be joint or several liability of two or more tortfeasors. If two or

more tortfeasors are jointly liable to a plaintiff, then the 1945 Act authorizes and

regulates contribution among those joint tortfeasors.

[¶58.]      The 1987 Act we apply today (SDCL 15-8-15.1 and 15-8-15.2) does not

involve contribution among joint tortfeasors. It regulates the predicate question

whether, and to what extent, individuals are jointly and severally liable to a

plaintiff in the first instance. The primary purpose of this Act is to limit the extent

of joint and several liability of defendants. *See* SDCL 15-8-15.1.

[¶59.]      Thus, although codified together, separate procedural steps and

separate substantive considerations are involved in applying the statutes in SDCL

ch. 15-8. As today's case illustrates, a plaintiff seeking a joint and several liability

judgment against a defendant must first satisfy the limitations on joint and several

liability in the 1987 Act. Once the existence and extent of joint and several liability

is established under SDCL 15-8-15.1 and 15-8-15.2, joint tortfeasors may then seek

contribution among themselves under the 1945 Act (SDCL 15-8-15). Today's case

only involves the first step of determining the extent of LaBolt's joint and several

liability under SDCL 15-8-15.1 and 15-8-15.2. Contribution among the joint tortfeasors is not at issue.

II

[¶60.] On Issue 3 regarding mitigation of damages, I concur in the result reached by Chief Justice Gilbertson. Considering the summary judgment facts in a light most favorable to LaBolt, those facts only suggest that WestCon *suspected* theft. But because the most favorable inferences from the summary judgment facts do not suggest that WestCon had *full and specific* knowledge of the *particular* injury and harm resulting from Pew's conversions until Pew's thefts were actually discovered, mitigation principles do not apply as a matter of law.

[¶61.] Both Chief Justice Gilbertson and Justice Konenkamp agree that contributory negligence is not a defense to an action for conversion. *See Justice Konenkamp's dissent* ¶ 78 (citing Restatement (Second) of Torts § 918(1)); *Chief Justice Gilbertson's opinion* ¶ 50 (citing *Rensch*, 393 N.W.2d 269). With respect to mitigation of damages, both opinions rely on *Security State Bank*, which discussed the general rule and the limitation on the defense of avoidable consequences (mitigation of damages) as set forth in the Restatement (Second) of Torts § 918(1) and (2):

> (1) Except as stated in subsection (2), one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.

> (2) One is not prevented from recovering damages for a particular harm resulting from a tort if the tort-feasor intended the harm or was aware of it and was recklessly disregardful of it, unless the injured person with knowledge of the danger of the

> harm intentionally or heedlessly failed to protect his own interests.

433 N.W.2d at 235.  We explained the general rule stated in subsection (1) and its limitation stated in subsection (2) as follows:

> Where one has rendered the consequences of the wrongful act complained of more severe or injurious by some voluntary act which it was such person's duty to refrain from, or if by neglect the person has failed to exert himself reasonably to eliminate the injury and prevent the damages and has thereby suffered some additional injury, he cannot recover such damages as are to be attributed to such acts or omissions.
>
> This rule does not require [a plaintiff] to anticipate the injury before it occurs[, which is contributory negligence] but rather relates to an act or omission relating to the injury after it occurs[, which is mitigation of damages].

*Id.*

[¶62.]	The disagreement in this case arises in application of the "anticipat[ion of] the injury" distinction mentioned in this last limiting sentence.  Both legal and factual difficulties make application of this distinction problematic in continuing tort cases.  The legal difficulty arises because of the similarity of the doctrines of contributory negligence and mitigation of damages:

> Both doctrines rest upon the same fundamental policy of making recovery depend upon the plaintiff's proper care for the protection of his own interests, and both require of him only the standard of the reasonable person under the circumstances.  The statement commonly made as to the distinction between the two is that contributory negligence is negligence of the plaintiff before any damage, or any invasion of his rights, has occurred, which bars all [(or in South Dakota may bar some)] recovery.  The rule of avoidable consequences [(mitigation of damages)] comes into play after a legal wrong has occurred, but while some damages may still be averted, and bars recovery only for such damages.

C. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 65, at 458 (5th ed. 1984)).

[¶63.] The factual difficulty arises because Pew stole approximately 100 loads of grain over a period of two years. Further, as Justice Konenkamp correctly points out, LaBolt produced evidence for summary judgment purposes suggesting WestCon "suspected" that there was an ongoing loss of grain that was being caused by theft. *Justice Konenkamp's dissent* ¶¶ 74-75. WestCon suspected theft as early as May 5, 2003, nineteen months before all of the conversions had occurred and all the damages had been sustained. And finally, although WestCon suspected theft, there is evidence suggesting that if WestCon would have taken better security measures earlier, Pew would have been apprehended earlier, which would have stopped the thefts and reduced WestCon's damages.

[¶64.] Thus the dilemma: was WestCon's failure to act on "suspicion" the unavailable defense of contributory negligence in failing to discover the invasion of its rights before the injury or damage was incurred? Or, was WestCon's failure to act on "suspicion" the available defense of negligence in failure to mitigate damages after the conversion had occurred but while some damages could still have been averted? Most courts conclude that failure to act on suspicion is contributory negligence rather than the failure to mitigate damages. *See infra* ¶¶ 67-71.

[¶65.] Justice Konenkamp relies on an unpublished federal district court opinion holding that the mitigation defense barred recovery in a continuing forged endorsement scheme "after February 29, 1992, since [the plaintiff], with *knowledge* of [the tortfeasor's] fraudulent scheme, heedlessly failed to protect its own interests

after that date." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 1996 WL 432488, at \*4 (E.D. Pa. 1996) (emphasis added) (unpublished). But that case is inapplicable because that plaintiff's acts and omissions occurred with full knowledge and only after the plaintiff had acquired specific information of the tortfeasor's scheme. The court noted that the plaintiff was acting "with *full knowledge*," and heedlessly failed to protect its interests. *Id.* at \*6 (emphasis added) (citing Restatement (Second) of Torts § 918(2)). The court further noted that it had applied mitigation rules "only for the period *after* [plaintiff] received *specific* information about [the particular tortfeasor's] peculations . . . ." *Id.* at \*7 (emphasis added).

[¶66.]     In our case, there is no dispute that as of May 5, 2003, WestCon did not have full knowledge and the specific information regarding Pew's thefts. LaBolt's factual allegations resisting summary judgment only reflect WestCon suspected that Pew's type of theft might be occurring. *Justice Konenkamp's dissent* ¶¶ 74-75. Because LaBolt produced no evidence even suggesting that WestCon had full and specific knowledge that Pew was stealing truckloads of grain from one of WestCon's silos, *Universal Premium* is no authority for a mitigation defense in this case.

[¶67.]     Courts of Appeal from Arizona, Wisconsin, and Texas more persuasively demonstrate proper application of the mitigation rules discussed in *Security State Bank* and the Restatement (Second) of Torts § 918(2) when there is an ongoing series of conversions. Most apposite is *Strawberry Water Co. v. Paulsen*, 220 Ariz. 401, 207 P.3d 654 (Ariz. Ct. App. 2008). In that case, a property owner

had been diverting water from a water company's supply line by means of a diversion pipe. *Id.* at 405, 207 P.3d at 658. The water company sued the property owner for conversion of water occurring over the four years before the water company actually discovered the pipe. *Id.* Like the case we are considering today, that defendant argued that the plaintiff should have mitigated damages by taking measures earlier to ascertain the cause of its losses. But the court noted that the damages at issue were for a period preceding the plaintiff's "discovery" of the specific conversion by the specific defendant. *Id.* at 410, 207 P.3d at 663. Therefore, the court noted that the evidence the defendants relied on to support their mitigation instruction referred to the plaintiff's "diligence in *discovering*, not *remedying*, the damages." *Id.* (emphasis added). The court further held: "Mitigation of damages only applies once the plaintiff, knowing of the damage, fails to mitigate. The plaintiff's knowledge must be of the '*particular harm*' intended by an intentional tortfeasor." *Id.* (emphasis added) (citing Restatement (Second) of Torts § 918(2)). Because the water company did not have knowledge of the particular harm until it actually discovered the property owner's diversion pipe, the court refused to allow a mitigation defense that was premised on the theory that an earlier discovery would have prevented future conversions and damages. *Id.* at 410-11, 207 P.3d at 663-64.

[¶68.]     The Wisconsin Court of Appeals, interpreting Restatement (Second) of Torts § 918(2), also concluded that actual knowledge of an intentional tort is required before the mitigation defense may be asserted. *S.C. Johnson & Son, Inc. v. Morris*, 322 Wis.2d 766, 786, 779 N.W.2d 19, 29 (Wis. Ct. App. 2009). In that case,

employees of S.C. Johnson had conspired with outside transportation companies over a period of ten years to solicit bribes in return for inflating transportation invoices and overcharging S.C. Johnson. *Id.* at 775-76, 779 N.W.2d at 24. The defendants argued "that S.C. Johnson had a duty to put a stop to the conspiracy at a much earlier date because it should have figured out for itself that something was amiss and duly mitigated the damage." *Id.* at 774, 779 N.W.2d at 23. The question presented was the same mitigation question with which we are confronted in this continuing tort case; i.e.:

> [W]hether a . . . victim of an intentional tort must have actual knowledge of the tort before it is required to mitigate damages, as [plaintiff] asserts, or whether the duty to mitigate arises when it is shown that the victim might have found out about the tort earlier had there been a better internal corporate investigation mechanism.

*Id.* at 784, 779 N.W.2d at 28.

[¶69.]     The *S.C. Johnson* court concluded that a mitigation defense is unavailable under the "should have known" theory. *Id.* Instead, the court applied the Restatement (Second) of Torts § 918(2)'s requirement of actual knowledge of the tort, explaining:

> It makes no sense to us that an injured party should be held responsible for negligently failing to discover that someone else was intentionally harming them. *Instead, if one party is intentionally harming another, logic would hold that the duty of the victim should be less than it would be for contractual breaches or negligence.* So unless the victim, with *actual knowledge* of the danger, intentionally fails to act in the protection of his or her own interests or is heedlessly indifferent to them, there is no duty to mitigate an intentional tort.

*S.C. Johnson*, 322 Wis.2d at 786, 779 N.W.2d at 29 (emphasis added). The court also declined to allow "should have discovered" mitigation theories because they

would "expand[] the duty to mitigate in such a way as to place a burden on the victim to investigate whether warning signals existed[, which] would allow tortfeasors to purposely exploit a victim's weak internal investigation mechanism and then use it as an affirmative defense at trial." *Id.* at 774, 779 N.W.2d at 23.

[¶70.] In *Southwest Bank v. Information Support Concepts, Inc.*, 85 S.W.3d 462, 463 (Tex. App. 2002), an employee converted over $300,000 by depositing 183 of her employer's checks in her personal bank account over an eighteen-month period. Her employer did not have an account at that depository bank. Nevertheless, the bank accepted the deposits over inadequate endorsements and allowed payment on the checks. *Id.* The bank's mitigation defense was predicated on the theory that if the employer had only looked at its bank statement, it would have discovered the forgery and theft and "interrupted [the employee's] stream of stolen check deposits at [the depository bank]. As a consequence, [employer] would have sustained smaller damages from [the depository bank's] conversion of the checks." *Id.* at 469. But the Texas Court of Appeals disallowed the mitigation defense, holding that this "chain reaction of events" theory was contributory negligence rather than the failure to mitigate damages. *Id. See also Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245, 249 (D.C.N.Y. 1984) (rejecting a mitigation defense on defendants' argument that plaintiffs' acts or omissions in a continuing tort case "delayed discovery of the alleged fraud and therefore allowed damages to continue to grow").

[¶71.] Like *Strawberry Water Co., S.C. Johnson, and Southwest Bank*, LaBolt's mitigation defense is premised on a chain of events theory conjecturing

that WestCon would have discovered Pew's thefts earlier if it had employed security measures earlier. This would have interrupted Pew's stream of thefts, and in turn, WestCon would have sustained fewer damages. But as those courts explain, this chain of events theory is a claim of contributory negligence for the failure to discover the conversion and damages rather than the failure to act reasonably in mitigating damages after the conversion has occurred.

[¶72.]       "[W]e require 'those resisting summary judgment [to] show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof.'" *Bordeaux v. Shannon Cnty. Schs*, 2005 S.D. 117, ¶ 14, 707 N.W.2d 123, 127 (quoting *Chem-Age Indus.*, 2002 S.D. 122, ¶ 18, 652 N.W.2d at 765). In this case, LaBolt had the ultimate trial burden of proving the defense of failure to mitigate damages. *Kowing v. Williams*, 75 S.D. 454, 459, 67 N.W.2d 780, 783 (1954). Yet it failed to meet its summary judgment burden of showing it would have been able to present evidence that WestCon had full and specific knowledge of the particular harm being inflicted by Pew. Like *Strawberry Water Co., S.C. Johnson*, and *Southwest Bank,* there is no evidence that WestCon had actual knowledge of Pew's conversions. Until Pew was caught, WestCon may have suspected theft, but LaBolt identified no evidence even inferentially suggesting that WestCon had full knowledge of the particular harm; i.e., that Pew was stealing from a WestCon silo by acting as if he was normally transporting grain. Because WestCon's suspicions are not full knowledge of the specific information surrounding Pew's conversions, LaBolt failed to meet its summary judgment burden as a matter of law. Even *Universal Premium* did not

allow the mitigation defense until that plaintiff acquired "full knowledge" of the "specific information" concerning the particular tortfeasor's scheme. *Universal Premium*, 1996 WL 432488, at * 6-7. For the foregoing reasons, I would affirm the circuit court.

KONENKAMP, Justice (dissenting on Issue 3).

[¶73.] The Court first argues that the mitigation defense does not apply here because there is no duty to mitigate when there is a single ongoing, continuous conversion, as the victim is not required to anticipate an injury. Then it argues that the mitigation defense does not apply to a series of individual conversions, because the previous conversions do not trigger a duty to mitigate the subsequent conversions. When, then, is there a duty to mitigate damages in a conversion case? Clearly, this Court has applied the mitigation of damages defense to conversion actions. As early as 1892, this Court held that the victim of a conversion was limited to recoverable damages "commensurate with his actual loss; and any facts which, if established by proof, will go towards a mitigation of damages, are competent evidence in a trial of an action of trover or conversion." *See Stone v. Chicago, M & St. P. Ry. Co.*, 3 S.D. 330, 53 N.W. 189 (1892) (citations omitted). Moreover, this Court has clearly held that SDCL 21-3-3 allows for the mitigation defense. In *Security State Bank v. Benning*, the Bank argued that SDCL 21-3-3 "rules out mitigation." 433 N.W.2d 232, 233 (S.D. 1988). But we wrote that the Legislature did not specifically rule out mitigation in the statute, and, therefore, we

would "not enlarge the statute." *Id*. at 234. Thus, the Court unduly constrains the doctrine in conversion actions.

[¶74.] The duty to mitigate damages arises when an injured party "has knowledge of the danger or harm and intentionally or heedlessly fails to protect its own interests." *Id*. at 235 (citing Restatement (Second) Torts, § 918(2) (1979)). Here, WestCon was tortiously injured each time grain was stolen. Therefore, the focus must be on whether, after WestCon suspected it was losing grain through conversion, it intentionally or heedlessly failed to protect its interests. *See id*. When an ongoing series of conversions is occurring,

> It defies common sense, for the purposes of [mitigation and] avoidable consequences, to treat each [act] as a new and different, unknown and unanticipated, tort. Under this reasoning, [the injured party], with full knowledge of [the tortfeasor's] fraud, could have allowed it to continue for years without notifying [the defendant] and then have held [the defendant] liable for the full amount of the loss. [The injured party] may not with impunity turn a blind eye to [the tortfeasor's] misdeeds. . . . "The community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted."

*Universal Premium Acceptance Corp. v. York Bank & Trust Co*, 1996 WL 432488, *7 (E.D. Pa. 1996) (citations omitted).

[¶75.] Considering the evidence in a light most favorable to the non-moving party, LaBolt, there are genuine questions in dispute on the issue of mitigation of damages. LaBolt identified facts suggesting that WestCon may have intentionally or heedlessly failed to protect its own interests after it believed that conversions were occurring. As early as May 5, 2003, WestCon's manager, while reporting an unrelated burglary of WestCon's office, informed the police that WestCon believed

22,000 bushels of grain had been stolen. According to LaBolt's affidavit in opposition to summary judgment, WestCon's manager disclosed a suspected theft scheme while Pew was committing his offenses. According to the information provided by WestCon, the Milbank Police Chief believed that WestCon suspected something "criminal in nature" was occurring. Yet WestCon's credit manager conceded at the summary judgment hearing that WestCon employed no security measures to prevent the ongoing thefts until December 7, 2004.

[¶76.]    As evidence that WestCon failed to mitigate its damages, LaBolt also relied on Pew's deposition testimony, in which Pew described how easy it was to steal WestCon's grain. He would drive up to the silo, park under the chute, pull on a chain, and the grain would gravity load into his truck. It took about three minutes. He was able to steal grain loads over 100 times because WestCon did not actually lock the silo. Pew could see the padlocks hanging by the chute. The chute, as described by Pew and another witness, was twenty feet from the ground. Pew was able to steal the grain without having to climb up to the chute, "jimmy" a lock, or use any kind of special tool. "Occasionally," according to Pew, WestCon would lock the silo chute and Pew could not steal any grain. Thus, there is evidence that WestCon was able to secure its grain but did not regularly do so.

[¶77.]    Allowing a mitigation defense in a conversion case does not mean that "the injured person has a duty to act" or "that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm[.]" Restatement (Second) Torts, § 918 cmt. a. Rather, "recovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be

discouraged from wasting their resources, both physical or economic." *Id.* WestCon did not have a duty to mitigate damages before the grain was first stolen, but if WestCon had information that its grain was steadily disappearing through conversion and heedlessly failed to protect its business interests, a duty to mitigate may have arisen. *See Universal Premium Acceptance Corp.*, 1996 WL 432488.

[¶78.]     This is not the same as saying that WestCon's damages should be reduced because it was negligent, *i.e.*, "could have avoided [the harm] by the use of reasonable effort or expenditure after the commission of the tort." *See* Restatement (Second) Torts, § 918(1). Nor does it mean that Pew should somehow escape criminal responsibility for his thefts because of WestCon's failure to mitigate its damages. *See* Restatement (Second) Torts, § 918 cmt. a ("[A] wrongdoer is criminally responsible for all the legal consequences of his crime, irrespective of the lack of care of his victim, either before or after the commission of the tort."). Rather, the question here is whether WestCon "intentionally or heedlessly failed to protect [its] own interests" after it had knowledge of the danger or harm. *See* Restatement (Second) Torts, § 918(2). The record contains genuine issues of material fact on this question of damages.

[¶79.]     This issue should be reversed and remanded for a trial on mitigation of damages. I concur on the other issues.

[¶80.]     MEIERHENRY, Justice, joins this special writing.